[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 09-12416

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
DEC 4, 2009
THOMAS K. KAHN
CLERK

D. C. Docket No. 03-23327-CV-JEM

FREDERICK W. CUMMINGS,

Petitioner-Appellee,
Cross-Appellant,

versus

SECRETARY FOR THE DEPARTMENT OF CORRECTIONS,
Walter A. McNeil,

Respondent-Appellant,
Cross-Appellee.

_____

Appeals from the United States District Court
for the Southern District of Florida

_____

(December 4, 2009)

Before TJOFLAT, BIRCH and HULL, Circuit Judges.

HULL, Circuit Judge:

Florida death row inmate Frederick W. Cummings[1] petitioned the district court, pursuant to 28 U.S.C. § 2254, for a writ of habeas corpus. After review and oral argument, we conclude that Cummings's trial counsel did not provide ineffective assistance in the investigation and presentation of mitigation evidence at the penalty phase of Cummings's murder trial. Thus, Cummings's § 2254 petition must be denied.

## I. BACKGROUND

### A. Facts of the Crime

In Florida state court, Cummings was convicted of murdering his girlfriend Kathy Good (after she obtained a restraining order against him) and of the armed burglary of Good's home. The Florida Supreme Court summarized how Cummings broke into Good's home and stabbed her repeatedly:

> Fred Cummings-El dated the victim, Kathy Good, for a short period and the two lived together for several months. After the relationship ended, Cummings-El harassed Good and she eventually obtained a restraining order after he assaulted her at a neighbor's house. He then made numerous verbal threats, such as: "Kathy, I'm going to kill you. Kathy, I'm going to kill you[ ]"; and "I love her. If I can't have her, nobody [can] have her"; and finally "If I can't have you, ain't nobody going to have you."

---

[1]Petitioner was born Frederick Wooden and later changed his name to F. W. Cummings. Throughout the state direct and collateral proceedings, as well as during the present federal habeas proceedings, Petitioner has been referred to inconsistently, sometimes as "Cummings," at other times as "Cummings-El," and occasionally using his former surname of Wooden. In this opinion, we refer to Petitioner by the name used on his § 2254 petition, Frederick W. Cummings.

Cummings-El broke into Good's home in the early morning hours of September 16, 1991, and stabbed her several times while she was sleeping, killing her. Several people heard Good's screams and saw Cummings-El at the scene. Good's eight year-old son, Tadarius, was asleep in bed with his mother and awoke to see Cummings-El "punching" his mother. Good's twenty year-old nephew, Michael Adams, was asleep on the floor of Good's bedroom and saw Cummings-El fleeing from the house. And Good's mother, Daisy Adams, confronted Cummings-El as he was leaving the bedroom. Cummings-El, whose face was only one or two feet from Daisy's, shoved Daisy to the ground and ran. Good then staggered from the bedroom and collapsed in her mother's arms, saying, "Fred, Fred."

Cummings-El v. State, 684 So. 2d 729, 730-31 (Fla. 1996) ("Cummings I")

(brackets in original). In short, Cummings "armed himself with a knife, waited outside Good's home until she arrived . . . , broke into her house after she was asleep, and attacked her in her sleep." Id. at 731. Trial evidence showed that Good received numerous stab wounds from Cummings, including defensive ones; was conscious for several minutes after the attack; and died from the blood filling her lungs – in essence, "she drowned in her own blood." Id. On the date of the crime (September 16, 1991), Cummings was 33 years old.

## B. Pre-Trial Proceedings

Cummings was charged with first-degree murder and armed burglary. On January 4, 1993, the state trial court conducted a pretrial hearing. Cummings's trial counsel Theodore Mastos informed the court that Cummings did not want to present any mitigation evidence if he was convicted, and was refusing to provide

3

Mastos with mitigation-related information. Mastos and the State Attorney jointly requested that the state trial court (1) conduct a colloquy with Cummings about his desire not to present mitigation evidence, and (2) order a psychiatric evaluation to ensure that Cummings's decision not to present mitigation evidence was a knowing and voluntary waiver rather than the product of a mental infirmity.

The state trial court conducted a colloquy. Cummings said he was not guilty and did not want his family testifying for him:

> When [Mastos told] me . . . that [if the] State finds me guilty they were going to execute me, do I want to plead for my life?
> Like I told Mr. Mastos, I'm not guilty of this charge.
> Now, if you want to talk to my family members, he's welcome to. Now, when this go to trial and however the outcome may be, which I'm not guilty of this case, whatever the outcome may be, I don't want my family standing up here pleading for something that I'm not guilty for. I'm not guilty of this charge. Why should my family have to stand up here to plead for my life? They don't have no evidence saying I killed nobody. The only thing they say is what people say.

The state trial court informed Cummings that presenting mitigation would not be inconsistent with maintaining his innocence and would not waive his right to appeal his conviction. Cummings again told the court that he did not want to present mitigation evidence. Cummings said he might as well be dead if the jury found him guilty, as he did not want to sit in prison for life and he did not want his family begging for his life:

4

What's the difference between a life sentence and death?  I'm not guilty.  There's no difference. . . .  I am not going to sit in no prison for something I didn't do the rest of my life.  I might as well be dead if you find me guilty of something I'm not guilty for.

So I'm not going [to have] my family beg for my life . . . .  I have children out there.  I'm not going to have them begging for my life.

The state trial court then explained to Cummings that it would order a psychological evaluation to ensure Cummings's decision was knowing and voluntary, and that he was competent to make it.  The state trial court explained that it was ordering an evaluation "[b]ecause there's very little down side risk" if Cummings's family testified in the penalty phase, and that it was not begging but rather providing information for the jury "about you as a human being, as a father, as a brother, as a son, as a person, so the jury has a better idea of who you are and what's happened to you during your life."  Cummings said he understood, but Cummings again said that serving a life sentence in prison and being unable to do anything for his children would be torture, and he would rather be dead:

THE DEFENDANT: You know, I understand fully what you are saying.  But when you're locked up and you have children – I have teen-age children.  I don't need to be hearing about they going through these changes, they going through these changes.  They are locked up.

My daughter is going to be 16 years old.  My baby is 10.  My daughter will be nine months old.  You see what I am saying?  When these kids get big I'm sitting in prison with a life sentence.  What can I do for them?  What can I provide for them?  What are they going to say, my daddy is in prison?  I rather they say my father is dead.  What

is the difference?  What can I do for my child[?]

THE COURT: You could be available to get letters from them, to see them.

THE DEFENDANT: That's torture.

The state trial court then questioned Cummings about permitting an investigation into mitigation evidence, and Cummings said Mastos could talk to his family members:

THE COURT: Would you have any objection if your lawyer at least were able to talk with family members to find out about you?

THE DEFENDANT: As I stated to him and told you, he can talk to all my family members and who he wants to talk to.

THE COURT: And if he finds something that would . . . have benefit for you, then I assume that he would be able to talk to you about that first, so that there may be a possibility that maybe a week from now or 10 days from now Mr. Mastos might say something to you, believe it or not, which may change your mind as to the second phase of the trial.

I want him to at least be able to gather information so that he can say to you, Fred, look, I know your feeling, but this is what I have heard and according to the law this may be helpful for you.

How about that?  Will he be able to do that at least?

THE DEFENDANT: Yes, sir.

THE COURT: All right.

[THE DEFENDANT:] As I said, I'm not guilty and I'm not going to be found guilty, I believe.

Cummings informed the state trial court that he wanted to go to trial as soon as possible.[2]

---

[2]During the hearing, Cummings also indicated that he wanted to discharge Mastos as his counsel because Cummings believed Mastos was working against him and had not been to see him enough times.  The state trial court stated that it had seen nothing showing Mastos was not working in Cummings's interest, and Cummings responded that Mastos had been trying to

The next day, Dr. Sanford Jacobson evaluated Cummings with regard to his mitigation decision. Dr. Jacobson found that Cummings was competent and had an acceptable appreciation of the charges against him, the nature of the legal process, and the possible penalties he could incur. Dr. Jacobson further concluded:

> With respect to [Cummings's] feelings about family members testifying in any sentencing phase if it were necessary, I can only state that [Cummings's] explanation does not appear to me to be irrational or bizarre. It may not be in his best interest at this time but [Cummings] might, if necessary, alter that opinion or view.

Additionally, Dr. Jacobson reported that, during his interview with Cummings, Cummings "talked about his family and noted that he was the 7th of 12 children. He described a good relationship with his mother and his siblings." Cummings reported he had used marijuana, alcohol, and cocaine, but no longer abused them, was not dependent, and had no problems with drugs.

## C. Penalty Phase

On January 25, 1993, the trial began. It lasted four days. The jury found Cummings guilty of the first-degree murder of Kathy Good and the armed burglary of her home. The state trial court recessed to permit Mastos and Cummings to

---

convince him to take a plea. Mastos responded that he had been diligently investigating the case, visiting with Cummings, and providing him with information about his case. Cummings reiterated that Mastos had been urging him continually to take a plea. Cummings stated that if he could not have Mastos discharged, he wanted to go to trial. The state trial court declined to discharge Mastos.

confer.  Cummings's family members, including at least two sisters, attended the trial.

After the recess, Mastos indicated he was prepared to proceed with the penalty phase because Cummings did not want to present any evidence. Cummings told the state trial court he did not want to spend his life in prison, did not care if he was sentenced to death, and wanted no mitigation evidence presented on his behalf:

> THE DEFENDANT: . . . [T]he people found me guilty of First Degree Murder.  What everybody wants is to see my family pay for it and what's the difference between a life and twenty-five years in prison or in an electric chair.  They're looking for sympathy.  You all got it. You wouldn't see no justice here.  There is no need.  I ain't going to beg.  I never was a begg[a]r and ain't going to start now.
> THE COURT: Mr. [Cummings], it's not a matter of begging anybody, sir.  It's a matter [of] presenting information to people to help me.
> THE DEFENDANT: . . .  I don't want to spend my life in prison.  I'm thirty-five years old.  There's a twenty-five year mandatory.  Give me a break.  What's the difference?  What's the difference?  Who's going to take care of me for twenty-five years in prison?  You're telling me that you want me to get up everyday knowing that my life is in prison having to deal with the hustle and [bustle] in prison?  That's for a fool.  That's like me saying have mercy on me. . . .  I'm not going to beg, your Honor.

One of Cummings's sisters addressed the court, and Cummings objected to her testifying for him, saying:

> She cannot ask anything because it's my right not to have my family getting on the stand.  I told my family from the start, when he came with me over a year ago, I told him I don't want my family begging

8

for nothing and I don't want no tears in here from my family." The state trial court asked Cummings's sister whether "there [are] people who know Mr. Cummings[], members of his family, that want to be here and talk to the jury." When his sister said yes, the state trial court re-set the penalty-phase hearing for the following week. Cummings again objected, and reminded the court he had been sent to the psychiatrist and found competent and that he had chosen not to have his family members plead for him and he didn't want his family testifying. Mastos told the court that although Mastos "found it frustrating that [Cummings] didn't want [his family] involved," Mastos "respect[ed] him and his opinion and he articulates it well."

The state trial judge responded that the only issue in the case at that time was the sentencing decision that he would have to make, and "I . . . want to hear from [Cummings's] family." The state trial court reiterated that "[a]s far as . . . this Judge is concerned[,] I'm going to ask the jury [to reconvene next week and] I'm going to suggest that [Cummings's] family . . . contact Mr. Mastos between now and then." The state trial court added, "I'm going to be ready for the sentencing phase . . . [unless] the State . . . find[s] any case law that will prohibit me from doing so. This is not only for the jury's benefit, but, quite frankly, for mine as well." Cummings again said he did not want his family begging for his life, and

9

the state trial court said that it "appreciate[d] that discussion, but at this point, we're going to proceed." The state trial court set the penalty phase to begin five days later.

The day before the penalty phase began, the State informed the state trial court that it intended to present the testimony of Laura Friar, a records custodian from the North Carolina Department of Corrections. Friar would testify about the records of Cummings's prior convictions and imprisonment in North Carolina for two armed robberies. Although Friar brought Cummings's North Carolina prison file with her, Friar had notified the State that some portions of that file were not public record and that she would not release those without a court order. Friar informed the state trial court that the public portions of Cummings's file included conviction, parole, and prison disciplinary records; the sealed, non-public portions included mental health records and records relating to Cummings's dealings with the parole commission.

The state trial court permitted the State to receive a copy of the public portions of Cummings's North Carolina file, but ordered that the non-public portions were to be sealed and given only to Mastos for his review.

Mastos received the sealed, non-public records the next morning, when the penalty phase began. He reviewed them when the court recessed at the close of the

State's case.  When the court reconvened, the state trial court asked Mastos whether he would present any portion of it to the jury.  Mastos said he would not, because "there is no evidence whatsoever of any psychoses or psychological problems that would affect a person's behavior and I have had a chance to review it and I will not be introducing anything from that."

At the start of the penalty-phase hearing, Mastos addressed the state trial court regarding mitigation evidence and advised that Cummings up to that point would not let family members testify but now had "softened a little bit on that" and would allow two sisters to testify.  The state trial court asked Cummings directly whether he would permit them at least to make a statement, and Cummings said he would.  Cummings's four children were also at the penalty phase hearing, and Mastos told the court "the boys and the daughter don't wish to testify."

The penalty phase commenced.  The State presented evidence of Cummings's prior violent felony convictions: (1) one count of aggravated battery with great bodily harm in Gadsden County, Florida; and (2) the two robberies with a dangerous weapon in North Carolina.[3]  The State also called Good's mother,

_____

[3]In 1984, a North Carolina court sentenced Cummings to a 14-year prison term for the two armed robberies.  In 1990, a Florida court sentenced Cummings to a 30-month prison term for an aggravated battery on Ezzie Morgan.  Mastos knew Cummings was also sentenced for crimes in California, but the State did not obtain or submit evidence of those convictions or sentences in time for use at the penalty phase.

11

Daisy Adams, and her nephew, Michael Adams. Daisy and Michael Adams testified about Good's suffering during the moments between the time Cummings stabbed her and her death. After it rested its penalty-phase case, the State sought to reopen its case to present the disciplinary record from Cummings's North Carolina prison files. The State Attorney told the court that the North Carolina files contained "evidence of five violent acts" by Cummings while he was in prison there.[4] Mastos opposed the motion to reopen, arguing that that evidence was not properly admitted. The state trial court ruled the prison disciplinary record was not to be admitted and denied the motion to reopen the State's case.

Cummings called as witnesses two sisters, Diane St. Fleur and Catherine Covington. Both sisters testified Cummings was a loving and good father, was honest, came from a large and supportive family, was protective of his family and was not violent.

Specifically, St. Fleur testified that she was seven years older than Cummings, and that their mother had six sons and six daughters, although three of the sons had already died. St. Fleur testified that Cummings was born Frederick Wooden (Wooden was their mother's surname), but changed his name to F. W.

---

[4]During the state postconviction proceedings, Mastos confirmed the North Carolina prison records showed "a number of disciplinary violations that had been violent, fight[s] in prison."

Cummings so he would have both his mother's and his father's names. St. Fleur

testified that Cummings had four children, all of whom were present in the

courtroom: a fifteen-year-old daughter, and sons aged ten, thirteen, and fourteen.

St. Fleur then testified about Cummings's character:

> Q. I want you to tell the jury what kind of a man is your brother? How does he treat members of his family for instance, let's start there. How does he treat the members of his family?
>
> A. He has treated them fine. You know, he is protective of his family, always [has] been, of his mother, his sisters, mother, brothers and his children.
>
> Q. How does he treat his children?
>
> A. He treat[s] his children very good.
>
> Q. Now during the last couple of years how would you characterize your relationship with Fred?
>
> A. We always have been close.
>
> Q. Is Fred an honest person? . . . .
>
> A. Yes.
>
> Q. Is he a violent person?
>
> A. I don't think he is a violent person.

St. Fleur's testimony then turned to the sentence to be imposed:

> Q. Now Diane, we are here of course because the jury has to make a recommendation as to what sentence the Court might impose in this case. What would you like to say to the jury about this penalty? What would you like to tell these 12 people?
>
> A. Well, I don't believe in the death penalty. I know the jury found him guilty, but I personally I don't believe it.
>
> Q. Well, we can't argue that. The jury has made that finding but as to a recommendation, do you want the jury to spare your brother's life?
>
> A. Yes.
>
> Q. Why? Is he a good person? Should they take that into account?

A. Yes. I think they should. You know he has four kids which I have been taking care of those kids plus I have four more. It's kind of a lot on you when you are taking care of eight children that are not yours and I feel like his life should be spared. My mother, she is very sick. That's why she couldn't even come to this trial you know. She had one slight stroke.

Q. So you are hoping that there comes a time when Fred can come back and be with his loving family?

A. Yes.

Q. Would you characterize your family as a loving family, a close knit family?

A. Yes. Very close.

Q. In fact, you have been here the whole time haven't you during this trial?

A. Yes.

Q. So what would you like the jury to do with this case? If you could sit in that jury room, what would you say to these 12 people?

A. I would like for my brother['s] life to be spared you know. You know because if you take his life, you know you are going to be taking more than him. . . . Because my mother, she can't take no more.

On cross-examination, St. Fleur stated that Cummings was the seventh oldest of their mother's twelve children, and the third-oldest son. The State asked St. Fleur when was the last time she lived with Cummings full-time, and she didn't remember, but thought it was sometime in the 1980s. St. Fleur reiterated her opinion that Cummings was not a violent person, but conceded that he had been convicted of earlier crimes, including armed robbery. St. Fleur also repeated that she did not believe Cummings was guilty of murdering Good. The State asked St. Fleur about the relationships among members of her and Cummings's family, and

14

she said they were close:

> Q.  Are you a close family?  You and your brothers and sisters?
> A.  Yes.
> Q.  So your brother has always had the attention and affection of the whole family, right?
> A.  Yes.  My whole family, yes.
> Q.  So he was never abandoned by the rest of the family, was he?
> A.  No.
> Q.  He always had that support?
> A.  My mother raised –
> Q.  All of you?
> A.  Yes.

Although St. Fleur testified that Cummings always took care of his children, she admitted on cross that either she or the mother of Cummings's children cared for them while he served prison terms in North Carolina and Florida.

Another sister, Covington, was Cummings's second and final witness. Covington testified that she was eight years older than Cummings and was his oldest sister.  Like St. Fleur, Covington testified that Cummings had good character:

> Q.  . . . I want you to tell the jury what kind of a man is Fred. I mean you . . . know[] him now as a brother, I want you to tell the jury.  How does he treat you as a sister?
> A.  As a sister Fred treats me very nice, nicely and also he is very nice[] to all his family.  Not just his family, to other people as well.
> Q.  Is Fred a[n] honest man?
> A.  Very honest.
> Q.  Yes?
> A.  I think so.

15

Q. Is he a violent man?
A. I don't think – not a violent person, no.
Q. I mean he has had some problems with law enforcement?
A. Yes, he has.
Q. He has gone to prison and we don't dispute that, but the Fred that you have known, have you ever seen him beating up anybody or striking anybody?
A. Well actually, yes. Yes, when he was a little younger, with a cousin, they just had like a little run in but other than that –
Q. So that was many, many years ago?
A. Yes. It's been a while back.

When asked why the jury should spare her brother's life, Covington said because he was innocent:

Q. Hypothetically if you could sit around the table with the 12 members of the jury, what could you say to them in asking them to spare Fred's life?
Why should his life be spared?
A. Because to be truthful, I really don't feel like Fred killed the girl. . . .
Q. What about Fred?
Why should this jury vote to recommend life in prison as opposed to taking his life in the electric chair?
A. Well, I don't feel like Fred done it. I really don't feel like Fred killed the girl.

Covington testified that Cummings tried to be a good father to his children, though he had been away from them at times, and had a good relationship with his children. On cross-examination, Covington admitted that for most of the last ten years, Cummings was not around his children because he was in jail. Covington acknowledged that several of the crimes of which he was convicted involved

16

violence, but testified that she never saw him do such things.

Following the penalty-phase hearing, the jury recommended a death sentence by an eight-to-four vote. The state trial court followed the jury's recommendation and imposed the death penalty.[5] The state trial court found four statutory aggravating circumstances: (1) a prior violent felony conviction; (2) the murder was committed in the course of a burglary; (3) the killing was especially heinous, atrocious, or cruel; and (4) the killing was committed in a cold, calculated, and premeditated manner. See Fla. Stat. § 921.141(5) (1993) (listing potential aggravating circumstances). The state trial court found no statutory or non-statutory mitigating circumstances to exist. See id. § 921.141(6) (listing potential mitigating circumstances). The court considered Cummings's sisters' testimony that Cummings was undeserving of death because he was a loving father, came from a close and supportive family, and was not a violent man, but rejected it. The state trial court acknowledged that St. Fleur and Covington "testified from their hearts," but concluded that their "family portrait of the defendant isn't based on fact or in reality as reflected by the evidence of this case."

D.     Direct Appeal

Cummings appealed, arguing, inter alia, that the state trial court erred in: (1)

_____

[5]The state trial court also imposed a twenty-two-year sentence for the armed burglary conviction.

striking two jurors for cause; and (2) finding the "heinous, atrocious, or cruel" ("HAC") circumstance applicable. The Florida Supreme Court affirmed. Cummings I, 684 So. 2d at 731 (concluding the juror strike claim was not preserved for review, and the HAC finding was proper because "[t]he record contains voluminous evidence of [Good's] suffering").

## E.    Rule 3.850 Motion and Hearings

In May 1998, Cummings filed in the state trial court a Florida Rule of Criminal Procedure 3.850 motion to vacate his convictions and death sentence. The same Florida trial court judge presided over Cummings's criminal trial and his Rule 3.850 proceedings. In the context of Cummings's state collateral proceedings, we refer to the state trial court as the "Rule 3.850 court."

Cummings amended his Rule 3.850 motion in June 1999. As amended, Cummings's Rule 3.850 motion contained eleven claims, including a claim that Mastos was ineffective for not investigating and presenting mitigation evidence at the penalty phase.

The Rule 3.850 court held a Huff hearing to determine the issues for which an evidentiary hearing was required. See Huff v. State, 622 So. 2d 982 (Fla. 1993). At that hearing, Cummings's initial Rule 3.850 counsel Lee Weissenborn indicated that Cummings still did not wish to cooperate with the investigation or presentation

18

of mitigation evidence. Weissenborn stated that Cummings was "concerned that he didn't get a fair trial at the guilt phase, but he didn't want to hear anything from me . . . about the penalty phase."

Afterward, on July 29, 1999, the Rule 3.850 court issued an order denying ten of Cummings's Rule 3.850 claims – all but his claim that his trial counsel Mastos was ineffective for failing to investigate and present mitigation evidence at the penalty phase. As to this claim, the Rule 3.850 court, out of "an abundance of caution," granted an evidentiary hearing despite Cummings's failure to allege what mitigation evidence should have been presented or even how he was prejudiced.[6]

Before the evidentiary hearing, Cummings moved to discharge

---

[6]The Rule 3.850 court stated in full:
CLAIM V:      This claim alleges that counsel was ineffective in that he failed to properly and adequately investigate and prepare mitigating evidence. Defendant has failed to state what the mitigating evidence would be and how he suffered prejudice as a result. A defendant m[a]y not simply file a motion for postconviction relief containing conclusory allegations that his or her trial counsel was ineffective and then expect to receive an evidentiary hearing. Kennedy v. State, 547 So. 2d 912 (Fla. 1989). See also Engle v. Dugger, 576 So. 2d 696, 700 (Fla. 1991); Valle v. State, 705 So. 2d 1331, 1334 (Fla. 1997); Teffeteller v. Dugger, 24 Fla. L. Weekly S 110, 114 (March 1999).
       There are some indications that the Defendant did not want to cooperate in the mitigation stage. Defendant was evaluated by Dr. Sanford Jacobson on January 5, 1993. The defendant told Dr. Jacobson "he did not want family members to testify in his behavior." See report of Dr. Jacobson, attached as Exhibit "D". When asked to explain, the Defendant told Dr. Jacobson there was no difference to him between life in prison or the death sentence because if he was in jail for the rest of his life, he was lost to his family.
       In an abundance of caution, this Court will conduct a[n] evidentiary hearing to determine if trial counsel was ineffective in failing to present mitigating evidence during the penalty phase.

19

Weissenborn, his first Rule 3.850 counsel, because Weissenborn allegedly was not working hard enough on Cummings's case, was not representing Cummings zealously enough, and was pursuing penalty-phase issues rather than guilt-phase issues. During the hearing on his motion to discharge Weissenborn, Cummings reaffirmed that he would rather have a death sentence than a sentence of life imprisonment:

> I don't want no life sentence. I just want a fair trial on the evidence and not the stuff that they concocted. That's not evidence. . . . I want a lawyer that's going to do the case for me. I don't know nothing about the law, but I don't want no life sentence. I want a death sentence, like you done gave me the first time. I don't want no life walking around in prison.

In January 2000, the Rule 3.850 court granted the motion and appointed new counsel to represent Cummings. Cummings's new Rule 3.850 counsel, Reginald Moss, amended Cummings's Rule 3.850 motion twice to raise four additional claims. The Rule 3.850 court held a second Huff hearing. Afterwards, it denied all the additional claims except Cummings's claim of ineffective trial counsel for failing to interview Cummings's mother and sister for mitigation purposes, which the Rule 3.850 court considered a supplement to Cummings's earlier claim of failure to investigate and present mitigation evidence.

In November and December 2000, the Rule 3.850 court held a six-day evidentiary hearing on the mitigation evidence claim, but Cummings did not testify

20

although he was present.  His new counsel called Cummings's sister, Covington; his niece, Catherine Wooden; his son, Frederick; the mother of his children, Deborah Dawson; his middle school principal, Moses Pool; a childhood friend, Eddie Webster; and three expert witnesses, Dr. Lynn Schram, Dr. Merry Haber, and Dr. Bruce Frumkin. The State called Mastos and two expert witnesses: Dr. John Spencer and Dr. Jane Ansley.  We summarize the testimony.

Covington testified that Cummings was her half-brother and nine years her junior.  Covington said their mother, Martha Wooden, was a good mother but was absent most of the time and was frequently out playing cards.  Martha Wooden did not work much, and the family lived off welfare.  Martha Wooden married Jules Wooden Sr., who was the father of six of Martha Wooden's children (but not Cummings).[7]

Cummings was the only child of their mother and Randolph Cummings. Covington did not know how long Randolph Cummings and Martha Wooden were together, but they never married and Covington did not know him very well. Martha Wooden had five other children by three other men, none of whom she married.  None of the men in Martha Wooden's life ever took on a surrogate-father-type role in Cummings's life.  The neighborhood had a lot of drugs and

---

[7]Most of Cummings's half-siblings were either deceased or incarcerated.  Only Covington, her sister Gladys, and her brother Bruce were alive and free.

21

other criminal activity. When Cummings was about twelve or thirteen, Covington began to suspect he was using drugs. Five of his half-siblings were using drugs then, too.

Cummings had four children with his girlfriend Deborah Dawson, and he loved his children. Cummings was not a harsh disciplinarian with his children, and Covington never knew him to abuse them. When Cummings was not in jail, his children lived with him, and he was active in their lives. He tried to teach them right from wrong, and to make for themselves a better life than he did for himself.

Covington attended one or two days of the guilt phase of Cummings's trial. After the guilty verdict, Cummings relented and allowed her to testify in the penalty phase. Mastos asked her a few questions about Cummings, then moved on to speak to the children.

On cross-examination, Covington testified that her family was close and supportive with each other. Covington and others in the family tried to help Cummings, to be supportive of him, to get him to quit using drugs. They tried to make Cummings understand how much they all loved him. With regard to Cummings's children, Covington admitted that Cummings twice moved out of state and left his girlfriend and his four children behind, at least once without any discussion beforehand.

22

Cummings's niece Catherine Wooden ("Catherine") testified next. Catherine was the daughter of Cummings's older half-sister Diane St. Fleur. Catherine grew up in the same house as Cummings; he left home when she was about twelve or thirteen. There were about eight to ten children living in the four-bedroom house at that time.

Catherine testified that when the children misbehaved, Martha Wooden would whip them with "whatever she could get her hands on at that time." Martha Wooden whipped Cummings with a mop handle, extension cords, and a belt. Catherine saw Martha Wooden whip Cummings about fifteen to twenty times over the years. The beatings left "really thick welts." However, Catherine admitted on cross that she considered Martha Wooden's whippings to be punishment, not abuse.

Catherine echoed Covington's testimony about Cummings's parenting – that he loved his children and spent time with them. When Cummings was in jail in North Carolina, his children were living with Deborah Dawson, their mother. Dawson began using drugs heavily, and Cummings from prison wrote a letter to the courts in North Carolina, arranging for his sister Diane to get temporary custody of his children.

Catherine first met Mastos the day the jury returned its guilty verdict.

23

Mastos asked her to sit outside the courtroom because he might call her as a witness, but did not tell her what he wanted her to testify about, or ask what information she had about Cummings or the case. Catherine would have been willing to talk to Mastos earlier if he had approached her.

Moses Poole, Cummings's middle-school principal, first met Cummings when he was in seventh grade. Poole remembered Cummings as being pleasant and friendly, and an average student. Cummings had no discipline problems at school. Cummings's brother Jules and sister Annie had serious discipline, attendance, and attitude problems, but Martha Wooden never took any beneficial action to correct it.

Deborah Dawson, the mother of Cummings's four children, testified that she was in a romantic relationship with Cummings for nine years; though they were never legally married, they considered themselves to be husband and wife. Cummings was a good father to his children and he would take them places like out to eat, to movies, swimming, and fishing. He disciplined the children to teach them to be good and respect others. On cross-examination, Dawson admitted that Cummings moved to California without her and without explaining why he was going; he "[j]ust up and went." At the time Cummings and Dawson had a three-year-old and a two-year-old child, and Dawson was pregnant with their third child.

Dawson later took the children and joined him in California.

Cummings's son Frederick testified that Cummings was a good father to him and his siblings, that Cummings was strict and taught them to respect others and get their work done. Cummings would take them to family activities like swimming, fishing, and cookouts.

Eddie Webster testified that he had known Cummings since he was about twelve, a period of more than thirty years. When he and Cummings were about thirteen, they started using drugs: cigarettes at first, then they started sniffing gasoline. The gasoline-sniffing lasted about a month. Many years later, after Cummings returned to Florida from California, they began smoking crack together.

The State called Mastos. At the time Mastos was appointed to represent Cummings, Mastos was a veteran criminal defense attorney who earlier had represented two capital co-defendants who were acquitted. Mastos already had served as a judge and a prosecutor. As a judge, Mastos presided over thousands of cases, including capital murder trials. In all, Mastos served ten years as a trial judge, plus seventeen years as either a prosecutor or a criminal defense attorney.

Mastos testified that before trial Cummings took the firm position that he did not want to present any evidence in the penalty phase. According to Mastos, Cummings repeatedly said he did not want a penalty phase. Mastos felt obligated

25

to request that Cummings be evaluated to determine whether this decision was knowing and voluntary. Once Dr. Jacobson determined that Cummings was competent, Mastos had no reason to doubt that Cummings's decision to forego a penalty-phase defense was a knowing and voluntary one. Mastos explained the penalty-phase process to Cummings and "had every reason to believe that [Cummings] understood" his explanation. Mastos testified he believed Cummings was an intelligent man, and, at that point, Mastos accepted Cummings's decision and did not investigate mitigation evidence:

Q. Did [Cummings] appear to understand your explanation of the process?
A. I had every reason to believe that he understood. And again, being [that] I thought Fred was an intelligent man. I mean, his ability to think and reason, look at the depos,[8] be in full command of the facts. Again, when he said, I don't want a penalty phase, that was – I accepted it.
Q. Did you go behind his back and investigate and prepare a penalty phase by contacting family members?
A. No.
Q. Or investigating his background or any of those things?
A. No.

Next, Mastos admitted that Cummings later grudgingly permitted him to talk to his two sisters, and that Mastos then talked with, and put on the stand, two of Cummings's sisters:

---

[8]Pre-trial depositions were taken of certain guilt-phase witnesses. Mastos gave copies of the depositions to Cummings, who reviewed them in prison and discussed their contents with Mastos.

26

Q. Earlier you said he bent a little bit, did there come a point where he allowed you, eventually allowed you to discuss his case with some family members?

A. Yes.

Q. Did he [sic], in fact, discuss his case with some family members?

A. There were two people, I believe, who were sisters, and they sat through most of the trial. And I remember meeting them and talking to them in the courtroom. I don't remember them ever coming to the office.

Q. But you did discuss –

A. Yes, we did.

Q. . . . Did your discussions with them give you any material, any information that you could have used in a penalty phase?

A. No.

Q. . . . Did you remember discussing with the defendant, [did he] give you any background material, any material that you thought you might have been able to use at a penalty phase?

A. No. . . . [Cummings] was always very guarded about his background and his family.

Q. Did his position, [as] regards the penalty phase, change any following the guilty verdict?

A. Well, grudgingly, he let me put these two people on for the limited . . . goal of trying to put a human spin on this case as to why the jury might spare his life.

Mastos reaffirmed that he presented a "limited" penalty-phase defense on

Cummings's behalf because of the limits Cummings had put on him:

Q. Do you recall what defense you did present at the penalty phase?

A. Very limited. And again, it was limited to trying to put some sort of a human side to this, that Fred did have a family, that he did have some children out there. That was basically all that I could do, you know, in the limited framework that he had put [on] this thing.

27

Mastos testified that his penalty-phase strategy was to emphasize Cummings's humanity and he would not have presented evidence regarding Cummings's antisocial personality disorder, crime-riddled family, or history of drug abuse even had he known about it.  Such testimony, Mastos stated, would have been contrary to his strategy and would have had a negative effect on the jury:

> Q. If you had requested a mental examination and the examination showed that the defendant had an Antisocial Personality Disorder, with the suggestion that the defendant was a psychopathic manipulator, is that something that you would have wanted the jury to hear?
>
> A. No.
>
> Q. Why not?
>
> A. That would make a bad situation worse.
>
> Q. In what respect?
>
> A. Well, it would defeat what I was trying to do, that is, put a human spin on it, [to show] that he's a human being with a family.  If they heard testimony that he was a manipulative psychopath, I mean, you might as well throw gasoline on a fire.
>
> Q. Okay.  If . . . the defendant came from a family of criminals . . . [or] the defendant himself had participated in criminal behavior of one sort [or] another nearly his entire life, would you have presented that to a jury?
>
> A. No.
>
> Q. And why not?
>
> A. Again, adverse effect on the jury.  You're trying to redeem the guy.  You're trying to show good qualities.  You show a life dedicated to crime, it's negative.
>
> Q. Okay.  What about alleged drug use by the defendant, . . . lifelong drug use?
>
> A. Well, drug use is like alcohol.  That sometimes can cut both ways.  You know, it certainly could help.

28

> I mean, for instance, if Fred had come clean in the very beginning with me, as he did ultimately after it was all over, then his cocaine use would have been an issue. So then he would have stood there all along and said, look, this, you know, this was caused by cocaine[-induced] rage or frenzy. But he never put himself there. Therefore, if I had testimony of drug use, it wouldn't mean anything.
>
> Q. Well, let me ask you this then. Drug abuse, drug use at a time other than the time of the crime, would that have been of any use to you?
>
> A. Probably very little.
>
> Q. In the absence of the –
>
> A. Jurors are not sympathetic to junkies generally.

Mastos's plan at the penalty phase was "[t]o let the jury see [Cummings's] children," to show that he had a life and family outside of prison. Mastos explained that this plan arose from the constraints imposed by Cummings's continued denial that he was guilty of Good's murder:

> [I]n light of his denial that he had been there, . . . you're in a very limited position of trying to show a jury that there is a human being there, that his life is worth something to his family and . . . he's a living, breathing person. So there is some worth.

In light of these constraints, Mastos testified that to present evidence regarding the extensive criminal history of Cummings's family would have been counterproductive:

> [Y]ou have a man who stood before this court, before this jury, before me and said I didn't do it, I didn't do it, I'll go to the electric chair saying I didn't do it. The jury hears a violent felony that takes place and then to bring in front of the jury that his whole family has a criminal history would be completely

29

> counterproductive.
>
> Q. In what way? . . .
>
> A. Because, instead of voting eight to four, they would have voted ten to two or twelve zip because they would have said, my God, the whole family is garbage.

On cross-examination by Cummings's Rule 3.850 counsel, Mastos testified about his investigation into mitigation evidence. Mastos first raised the issue of penalty-phase preparations with Cummings in late 1992, a few months before the January 25, 1993 trial. Cummings did not feel that a penalty phase was necessary but was not "quite that strident at that early stage." Mastos explained to him the propriety of preparing for a penalty phase, but to Cummings considering "anything less than victory was weakness," and Cummings "viewed the whole [penalty-phase] concept as begging." Mastos consulted with other attorneys who had tried first-degree murder cases as to what he should do in this situation, and some attorneys said that when a client is adamantly against it, you have no authority and cannot go behind a client's back. Mastos acknowledged there was no consensus on this issue.

Although at the January 4, 1993 pretrial hearing Cummings said that Mastos could talk to his family members, Mastos did not "ever recall anything Fred said that gave me some car[te] blanche authority to go and talk to his family members" because Mastos could "tell from [Cummings's] tone he didn't want a penalty

30

phase." Mastos did not believe he could go behind Cummings's back and conduct an investigation, as he did not want to violate the trust between Cummings and himself as his attorney:

> The bottom line to this case is, the client didn't want a penalty phase. He didn't want people begging for his life. I didn't feel, as his lawyer, that I was going to go behind his back and conduct an investigation. I didn't want to violate the trust that I thought existed between the attorney and the client. . . . I don't know what else to say about this case. I can't go back to 1993 and conduct some kind of an investigation that he didn't want.

Although Mastos eventually was able to put two of Cummings's sisters on the stand, Mastos reiterated that he never had full authority to conduct an investigation into mitigation evidence, and "[w]hatever [Cummings] gave me was grudging." Mastos testified that he "never considered it a warm and fuzzy invitation from Fred to go searching for nuggets of information."

Once Dr. Jacobson concluded that Cummings was mentally competent to waive mitigation, Mastos did not retain any other mental health witnesses to examine Cummings. Mastos also did not retain an investigator or conduct any investigation because Cummings did not want him to do so:

> I know we're going in circles here, but I took the man at his word. I did not conduct any investigation. I didn't feel that's what my client wanted. He grudgingly allowed me to talk to these people. I tried to get a few nuggets of humanity in front of the jury and that's it.

Mastos suggested to Cummings that Cummings have his family members call

31

Mastos, but Mastos never received any calls from them.

The Rule 3.850 hearing also featured the testimony of five mental health experts: three psychologists called by Cummings and two psychologists called by the State. The Florida Supreme Court summarized the expert mental health testimony as follows:

> During the hearing, Cummings presented . . . three mental health experts who testified regarding Cummings's mental state at the time of the crime and whether he suffered from brain damage.
> Dr. Lynn Schram, a clinical neuropsychologist, . . . testified regarding the tests he performed on Cummings. Dr. Schram concluded that Cummings suffers from an attention/concentration problem that could be indicative of some organic brain damage. Dr. Schram further testified that he could not diagnose brain damage with certainty, nor could he find that Cummings was impaired in his everyday functioning.
> Dr. Merry Haber, a forensic psychologist, testified that she was asked to evaluate Cummings and develop a psychosocial history to determine whether there were any mitigating factors that would affect Cummings's death sentence. Dr. Haber concluded that Cummings suffers from antisocial personality disorder and exhibits features of obsessive compulsive personality disorder, both arising from his poor upbringing. Dr. Haber stated that she believed that Cummings knew his conduct was wrong and that she could not diagnose brain damage with certainty.
> Lastly, Dr. Bruce Frumkin, a forensic clinical psychologist, testified regarding his evaluation of Cummings. Dr. Frumkin concluded that Cummings did not suffer from antisocial personality disorder, but rather, Cummings suffered from depression, polysubstance abuse, and cognitive inflexibility or "tunnel vision" that could be caused by some organic brain damage. . . .
> In response, the State presented the testimony of Dr. John Spencer, a clinical forensic psychologist, and Dr. Jane Ansley, a neuropsychologist. Dr. Spencer testified that his evaluations of

32

Cummings revealed no significant brain damage or gross cognitive impairments. He concluded that Cummings had antisocial personality disorder. Dr. Spencer also used a video interview of Cummings to reveal Cummings's ability to adapt his behavior to changing situations, contradicting a diagnosis that Cummings experienced "tunnel vision."

Dr. Ansley testified that her review of Cummings's medical history, the raw data obtained by the other experts in this case, and the results of the tests she administered to Cummings indicated that Cummings had no organic brain damage or executive function deficit. Dr. Ansley concluded that Cummings has antisocial personality disorder. She further testified that she disagreed with Dr. Schram's conclusion that Cummings experienced an attention/concentration deficit.

Cummings-El v. State, 863 So. 2d 246, 251-52 (Fla. 2003) ("Cummings II") ("-El" suffix in Cummings's name omitted).

**F.      Order Denying Rule 3.850 Motion**

In a twelve page order, the Rule 3.850 court denied Cummings's Rule 3.850 claim that his trial counsel was ineffective for failing to investigate and present mitigation evidence at the penalty phase. The Rule 3.850 court found that Cummings did not "m[e]et his burden of proving that trial counsel's conduct at the penalty phase amounted to deficient representation in light of [Cummings's] refusal to assist counsel in preparing for a penalty phase by expressly prohibiting counsel from presenting background evidence, irrespective of his later cursory consent to family members being contacted."

The Rule 3.850 court noted that Cummings's defense theory was mistaken

identity.  Mastos presented no other defense because Cummings did not agree to

any other defense, and Mastos felt he would lose Cummings's trust if he went

against his wishes.  The Rule 3.850 court noted Mastos's testimony that Cummings

did not want mitigation presented and only grudgingly allowed him to contact his

family:

> Mr. Mastos testified he was familiar with the aggravators and mitigators.  He testified that [neither] the Defendant nor his family members gave him any information that would have been useful in presenting evidence of statutory mitigating factors.  He stated that the Defendant was quite strong-willed and he could not convince him to do anything.  Mr. Mastos testified that the Defendant did not want him to contact his family members to testify on his behalf, that he did not want his family "begging for his life" because he was innocent. . . .
>
> Mr. Mastos further testified that Defendant grudgingly permitted trial counsel to contact family members, but maintained the position that he did not want them to beg for his life.  The record shows that at the January 4, 1993 trial hearing Defendant gave trial counsel permission to speak to his family members, but Dr. Jacobson's report dated January 5, 1993 demonstrates that Defendant did not want family members to testify.  However, during the penalty phase trial counsel presented testimony from the Defendant's two (2) available family members, to put a human spin on the case.  Some of the Defendant's children were in court during the penalty phase, but did not wish to testify, nor did Defendant wish them to testify.

Upon recounting this testimony, the Rule 3.850 court determined that (1) "no

absolute duty exists to introduce mitigating or character evidence," and (2) "trial

counsel is not deficient for failure to present testimony from reluctant family

members," and (3) trial counsel is not ineffective for following the instructions of

his client.

The Rule 3.850 court also concluded that Mastos was not ineffective as to investigation of mitigation evidence because "Mr. Mastos used the majority of his efforts in the guilt phase and cannot be faulted for following the wishes of his client in the penalty phase." The Rule 3.850 court found "that, under the circumstances of this case, the performance of trial counsel was within the parameters of 'prevailing professional norms.'"

The Rule 3.850 court reviewed the evidence Cummings developed at the Rule 3.850 evidentiary hearing and found that Covington, Catherine Wooden, Frederick Dawson, and Deborah Dawson "offered essentially the same non-statutory mitigation evidence as that presented at trial" by Covington and St. Fleur. Moreover, Mastos testified that he would not have presented much of the proffered 3.850 testimony because it either would not have been helpful or would have proven harmful:

> Mr. Mastos testified that he did not call . . . Deborah Dawson . . . because, according to Mr. Mastos, her testimony, like that of other civilian witnesses, would not have been particularly helpful to Defendant. Her testimony would have revealed, during cross-examination, that the Defendant was a drug user, supported her periodically, when he was not incarcerated, and voluntarily left her and the children when he moved back to Florida. . . .
> [Regarding] trial counsel's failure to introduce mitigation evidence including the extensive history of criminal conduct of Defendant's siblings, and Defendant's substance abuse[,] Mr. Mastos

35

was successful in keeping out details of Defendant's prior convictions. Mr. Mastos testified that he did not present the Defendant's previous incarceration records because he did not want the jury to think that Defendant was a career criminal, as this would not have elicited their sympathy. Moreover, while there are indicia of good behavior in the records, there are also notations of involvement in violent fights while incarcerated. The testimony by the family members at the evidentiary hearing would have exposed the jury to parts of the Defendant's criminal record that were not presented at trial. Mr. Mastos also testified that he would not have presented to the jury the criminal history of Defendant's family members as that would have resulted in the jury voting 10-2 or 12-0 for death, rather than 8-4. Trial counsel is not ineffective for failing to present background information which would have allowed the presentation of damaging or derogatory evidence, including violent tendencies, in rebuttal.

Regarding Defendant's drug use, . . . Mr. Mastos testified that the Defendant did not tell him about the drug use until after the trial was over. Counsel acknowledged that drug abuse can have a double-edged sword effect on the jury, as juries are not sympathetic to junkies generally. Further he believed that drug abuse testimony would have been helpful if the Defendant had claimed to have committed the crime while in a cocaine rage. Because the defense's strategy was to convince the jury that the Defendant was not present at the scene of the crime and did not commit the crime, and that Defendant is a decent, upstanding, family man, testimony of drug abuse at the penalty phase would not have been supportive of counsel's efforts. Counsel's strategic decisions will not be second-guessed on collateral attack.

In addition, the Rule 3.850 court cited Mastos's testimony that he would not have used the following other categories of mitigation evidence because they were inconsistent with the defense strategy: (1) extreme emotional disturbance; (2) an impaired ability to conform to the requirements of the law; and (3) antisocial or psychopathic personality disorder.

36

The Rule 3.850 court then addressed Cummings's and the State's mental health expert witnesses. The Rule 3.850 court found that "[t]he consensus of the expert testimony is that Defendant has an antisocial personality disorder, which is not a mitigating factor. They all agree that antisocial personality disorder does not cause criminal behavior, it explains it." The Rule 3.850 court summarized the testimony of Cummings's three experts (Drs. Haber, Frumpkin, and Schram) and the State's experts (Drs. Spencer and Ansley):

> Dr. Haber testified that the Defendant has obsessive compulsive personality traits. . . . She also found that he is manipulative and likes to present himself in the best light and likes to convey the impression that he is an upright moral kind of guy. Dr. Haber also testified that Defendant had the capacity to know what he was doing when he killed the victim. She determined that he acts without impulse control. She was concerned about the possibility of brain damage due to the Defendant suffering a head injury as a child and while in prison, even though he did not lose consciousness during either incident. Additionally, she acknowledged that huffing gasoline could cause brain damage. As she is not a neuro-psychologist, she could not diagnose brain damage with certainty.
>
> Dr. Frumpkin also testified about the Defendant's social history and head injuries. In addition to having an anti-social personality disorder, Dr. Frumpkin concluded that the Defendant is probably long-term chronically depressed. He agreed with Dr. Schram's conclusion that the Defendant cannot shift attention. On cross-examination, Dr. Frumpkin admitted that the impairment in Defendant's attention may not be due to improper brain functioning.
>
> Dr. Schram, whose background does not include extensive experience in forensics nor familiarity with the legal standards of incapacity, testified as to the results of a number of tests administered to Defendant. . . . Dr. Schram opined . . . that the Defendant has an attention and concentration problem, which is indicative of organic

brain damage. . . . [However,] Dr. Schram was unable to either definitively determine that Defendant suffers from brain damage, or find that Defendant is impaired in his everyday functioning.

Dr. Spencer found the Defendant has an anti-social personality disorder, but found no clinical evidence of significant brain damage. He testified that he personally observed that the Defendant could change his approach when confronted with information, known as changing sets. Dr. Spencer videotaped his interview with the Defendant. A portion of the tape was presented as evidence. The video clearly showed that the Defendant was capable of changing sets in the way he altered his mind set when responding to Dr. Spencer. As noted by Dr. Spencer, the tape revealed that the Defendant can become agitated, and not become violent. He can control his anger. Dr. Spencer also stated that it was possible to suffer from brain damage that is not detected or detectable. He stated that he did not see anything in his test results or in his interview with the Defendant that was indicative of organic brain damage.

Dr. Ansley provided a neuro-psychological evaluation. She testified that the results of her evaluation showed no indication of any organic brain damage and no executive function deficit. Dr. Ansley had reviewed the Defendant's medical history and the raw data from the testing performed by all of the aforementioned experts. She concluded that this data was valid and reliable, and integrated it into tests she performed on her own. Her findings, like those of Dr. Spencer, were that the Defendant has an anti-social personality disorder and type D on the McGarty scale. This type of individual, according to Dr. Ansley, generally does not do well in treatment as the person does not accept responsibility in general.

. . . Based on the results of the tests she conducted, as well as her review of Defendant's prison records, and the reports of the other expert witnesses, Dr. Ansley testisfied that she reached the conclusion that the head injuries and the drug usage reported by Defendant did not cause brain damage, and that the Defendant does not have any brain damage that would affect his ability to understand what he was doing when he killed the victim. Moreover, she concluded that it was a volitional choice to violate the restraining order.

After reviewing the expert testimony, the Rule 3.850 court found that (1) the

38

State's experts Dr. Spencer and Dr. Ansley were more credible, (2) Cummings had an antisocial personality disorder, and (3) Cummings had no organic brain damage.

Alternatively, the Rule 3.850 court found that even if Mastos's performance was deficient, the result at trial would not have been different, and thus Cummings could not prove prejudice. It stated, "the Court is convinced that the proposed mitigation evidence would not have made any difference on the outcome of the sentence[;] therefore, counsel cannot be ineffective for failing to present such evidence."

## G. Rule 3.850 Appeal and State Habeas Petition

Cummings appealed the denial of his Rule 3.850 motion to the Florida Supreme Court, and also filed a state habeas petition in that court. The Florida Supreme Court affirmed. Cummings II, 863 So. 2d at 249-50.[9]

The Florida Supreme Court recognized that the test for assessing Mastos's performance was not only whether he should have presented mitigation evidence, but also "whether the investigation supporting [Mastos's] decision not to introduce mitigating evidence . . . was itself reasonable," and that his investigation should be assessed through "an objective review of [Mastos's] performance, measured for reasonableness under prevailing professional norms, which includes a context-

---

[9]The Florida Supreme Court denied Cummings's state habeas petition, which primarily claimed that his appellate counsel was ineffective. Cummings II, 863 So. 2d at 253.

39

dependent consideration of the challenged conduct as seen from [Mastos's] perspective at the time." Cummings II, 863 So. 2d at 250-51 (quoting Wiggins v. Smith, 539 U.S. 510, 522-23, 123 S. Ct. 2527, 2536 (2003)) (internal quotation marks and emphasis omitted) (ellipsis in original). The Florida Supreme Court concluded that Mastos's performance was not ineffective in either his investigation or presentation of mitigation evidence. Id. at 252-53.

The Florida Supreme Court noted, for example, that Mastos called Cummings's sisters – Covington and St. Fleur – to testify in the penalty phase, and that they "testified that Cummings[] was good to his family, was not violent, and was innocent of the crime." Id. at 251. The Florida Supreme Court recounted the Rule 3.850 testimony that: (1) Cummings "was adamant about not wanting" mitigation evidence; (2) Dr. Sanford Jacobson evaluated Cummings and concluded he was competent to waive a mitigation defense; (3) "given his client's wishes during the penalty phase," Mastos's "strategy was to present Cummings[] in a positive light"; (4) Mastos "did not present evidence of Cummings[]'s drug use, poor upbringing, or that he came from a family whose members had substantial criminal charges and convictions, because he believed that such evidence would have an adverse effect on the jury"; (5) Mastos would not have presented the fact that Cummings had an anti-social personality disorder because it would have been

40

inconsistent with his trial strategy; and (6) Mastos was "successful in keeping out the details of [Cummings's] prior convictions." Id. at 252.

The Florida Supreme Court pointed out that in a "detailed order," the Rule 3.850 court "found that Mastos's strategy to present positive aspects of Cummings[]'s personality and to prevent negative evidence from being introduced was reasonable, particularly in light of the fact that Cummings[] made it extremely difficult for Mastos to obtain mitigating evidence." Id. The Florida Supreme Court also noted that the Rule 3.850 court "evaluated the mental health expert testimony . . . [and] found the video tape of the interview of Dr. Spencer and [Cummings] . . . [demonstrated Cummings's] ability to change his behavior as the situation changed. Additionally, the testimony of Dr. Ansley was extremely credible . . . [because of] her experience and expertise in the forensic neuropsychology field, and the thoroughness of her work in th[e] case . . . ." Id. at 252-53 (quoting Rule 3.850 court's order). And, the Rule 3.850 court "concluded that Cummings[] had not met his burden of proving that trial counsel's conduct at the penalty phase was deficient." Id. at 253.

Alternatively, even if trial counsel was ineffective in the penalty phase, the Florida Supreme Court noted that the Rule 3.850 court found that Cummings "has failed to show that . . . there was a reasonable probability that but for the errors

41

complained of, the result would have been different."  Id.  "[T]he testimony of Cummings[]'s friends and family members presented at the evidentiary hearing was essentially the same as the evidence presented at the penalty phase."  Id. at 252.  Moreover, "if Mastos had presented this additional testimony, it would have opened the door to extremely damaging testimony about Cummings[] on cross-examination."  Id.

The Florida Supreme Court also determined that the Rule 3.850 court's "factual findings . . . are supported by competent, substantial evidence."  Id. at 253.  In light of these factual findings, the Florida Supreme Court concluded that the Rule 3.850 court properly denied Cummings's claim:

> Applying the law to these facts, we find no error in the postconviction court's denial of relief based upon that court's detailed evaluation of the evidence.  Cummings[] has failed to establish that the outcome of his case would have been different had trial counsel presented the proposed mitigating evidence.

Id.

## H.    Federal Habeas Proceedings

In 2003, Cummings filed a § 2254 petition in federal district court. Cummings's petition claimed, among other things, that:  (1) the state trial court improperly applied the HAC aggravating factor; (2) trial counsel was ineffective in parts of the jury selection; and (3) trial counsel was ineffective for failing to

42

investigate and present mitigation evidence.

In 2004, Cummings filed a pro se motion to discharge Moss (his Rule 3.850 counsel) as his § 2254 counsel and appoint substitute counsel. Following an evidentiary hearing, the district court granted Cummings's pro se motion and appointed new counsel Todd Scher to represent Cummings.

Subsequently, Cummings's new counsel Scher moved for a competency evaluation and a stay of his § 2254 proceedings because Cummings had suffered a brain aneurism. Over the State's objection, the district court ordered Cummings evaluated and stayed the § 2254 case. After evaluation, the psychologist found Cummings competent and "capable of making decisions and understanding and participating in his legal affairs." The district court lifted the stay.[10]

In 2009, the district court granted in part and denied in part Cummings's § 2254 petition. The district court denied all of Cummings's claims except for his ineffective counsel claim as to mitigation evidence in the penalty phase. The district court granted Cummings a writ of habeas corpus as to that mitigation claim. It left intact Cummings's convictions. The State appealed as to the mitigation

---

[10]The State appealed the district court's decision to stay this § 2254 case to have Cummings's competency evaluated. Because Cummings was determined to be competent to proceed and the district court lifted the stay, we conclude this appeal claim is moot.

claim.[11]

## II. STANDARD OF REVIEW

We review de novo the district court's grant or denial of a § 2254 federal habeas corpus petition. Peterka v. McNeil, 532 F.3d 1199, 1200 (11th Cir. 2008), cert. denied, 129 S. Ct. 1039 (2009). Like the district court, though, we "are limited in our review of every issue decided in the state courts by a general framework of substantial deference." Parker v. Allen, 565 F.3d 1258, 1267 (11th Cir. 2009) (quotation marks and citations omitted); see Peterka, 532 F.3d at 1200-01. Pursuant to § 2254(d), as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"),

> [a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

---

[11]Cummings filed a notice of cross-appeal of the district court's denial of the remainder of his § 2254 claims. The district court granted Cummings a certificate of appealability as to his claims of (1) improper application of the HAC aggravating factor, (2) ineffective assistance of trial counsel (other than the mitigation evidence claim) and (3) ineffective assistance of appellate counsel. Cummings's brief on cross-appeal discusses only two claims: (1) ineffective assistance as to jury selection in the guilt phase; and (2) the HAC claim. Because both claims lack merit, we affirm the district court's denial of these claims.

44

28 U.S.C. § 2254(d).

A state court's decision is "contrary to" federal law if it "contradicts the United States Supreme Court on a settled question of law or holds differently than did that Court on a set of materially indistinguishable facts – in short, it is a decision substantially different from the Supreme Court's relevant precedent." Kimbrough v. Sec'y, 565 F.3d 796, 799 (11th Cir.), cert. denied,— U.S. —, — S. Ct. —, No. 09-6344 (U.S. Nov. 9, 2009) (quoting Williams v. Taylor, 529 U.S. 362, 405, 120 S. Ct. 1495, 1519 (2000)) (quotation marks and brackets omitted). A state court's decision involves an "unreasonable application" of federal law if it "identifies the correct governing legal principle as articulated by the United States Supreme Court, but unreasonably applies that principle to the facts of the petitioner's case, unreasonably extends the principle to a new context where it should not apply, or unreasonably refuses to extend it to a new context where it should apply." Id. (quoting Williams, 529 U.S. at 407, 120 S. Ct. at 1520) (quotation marks, brackets, and ellipsis omitted). "The question under AEDPA is not whether a federal court believes the state court's determination was correct but whether that determination was unreasonable – a substantially higher threshold." Schriro v. Landrigan, 550 U.S. 465, 473, 127 S. Ct. 1933, 1939 (2007).

### III. DISCUSSION

45

## A.     Ineffective Assistance of Counsel

In Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052 (1984), the

United States Supreme Court established a two-pronged test for resolving

ineffective assistance of counsel claims:

> A convicted defendant's claim that counsel's assistance was so
> defective as to require reversal of a conviction or death sentence has
> two components. First, the defendant must show that counsel's
> performance was deficient. . . .  Second, the defendant must show that
> the deficient performance prejudiced the defense.

Id. at 687, 104 S. Ct. at 2064.  The defendant must satisfy both the performance

and prejudice prongs to show ineffective assistance.  Id.

To establish deficient performance, a defendant must show that his counsel's

representation fell "below an objective standard of reasonableness in light of

prevailing professional norms" at the time the representation took place.  Bobby v.

Van Hook, 558 U.S. —, 130 S. Ct. 13, 16 (2009) (quoting Strickland, 466 U.S. at

688, 104 S. Ct. at 2064-65).  The test for reasonableness is whether counsel's

conduct fell "outside the wide range of professionally competent assistance."

Strickland, 466 U.S. at 690, 104 S. Ct. at 2066.  In judging the reasonableness of

counsel's performance, "the issue is not what is possible or what is prudent or

appropriate, but only what is constitutionally compelled." Chandler v. United

States, 218 F.3d 1305, 1313 (11th Cir. 2000) (en banc) (quotation marks omitted).

46

"[T]he Federal Constitution imposes one general requirement: that counsel make objectively reasonable choices." Van Hook, 130 S. Ct. at 17 (quotation marks omitted). Courts "indulge [a] strong presumption that counsel's performance was reasonable and that counsel made all significant decisions in the exercise of reasonable professional judgment." Chandler, 218 F.3d at 1314 (brackets and quotation marks omitted). This presumption is even stronger when trial counsel is experienced. Id. at 1316.

To satisfy the prejudice prong, a defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Porter v. McCollum, 558 U.S. —, — S. Ct. —, No. 08-10537, slip op. at 9 (U.S. Nov. 30, 2009) (quoting Strickland, 466 U.S. at 694, 104 S. Ct. at 2068). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694, 104 S. Ct. at 2068. To determine whether the defendant has shown prejudice, we consider all the available mitigation evidence, whether adduced at trial or during postconviction proceedings. Williams v. Taylor, 529 U.S. 362, 397-98, 120 S. Ct. 1495, 1515 (2000). In cases, like this one, where the defendant is challenging his death sentence, "the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of

47

aggravating and mitigating circumstances did not warrant death." Strickland, 466

U.S. at 695, 104 S. Ct. at 2069.

**B.     Client's Instruction Not to Investigate or Present Mitigation Evidence**

It is well established that counsel has "a duty to make reasonable

investigations" of potential mitigating evidence or "to make a reasonable decision

that makes particular investigations unnecessary." Wiggins v. Smith, 539 U.S.

510, 521, 123 S. Ct. 2527, 2535 (2003) (quoting Strickland, 466 U.S. at 691, 104

S. Ct. at 2066); see Porter, slip op. at 9-10 ("[U]nder the prevailing professional

norms at the time of Porter's trial, counsel had an 'obligation to conduct a thorough

investigation of the defendant's background.'" (quoting Williams, 529 U.S. at 396,

120 S. Ct. at 1515)). In any ineffectiveness case, an attorney's "decision not to

investigate must be directly assessed for reasonableness in all the circumstances,

applying a heavy measure of deference to counsel's judgments." Wiggins, 539

U.S. at 521-22, 123 S. Ct. at 2535 (quoting Strickland, 466 U.S. at 691, 104 S. Ct.

at 2066). Counsel's duty to investigate "does not necessarily require counsel to

investigate every evidentiary lead." Williams v. Allen, 542 F.3d 1326, 1337 (11th

Cir. 2008), cert. denied, 129 S. Ct. 2383 (2009). "Under Strickland, strategic

choices made after less than complete investigation are reasonable precisely to the

extent that reasonable professional judgments support the limitations on

48

investigation." Id. (quotation marks and citations omitted). Compare Strickland, 466 U.S. at 699, 104 S. Ct. at 2070 (stating that counsel's "decision not to seek more character or psychological evidence than was already in hand was . . . reasonable"), with Porter, slip op. at 11 (noting that counsel "failed to uncover and present any evidence of Porter's mental health or mental impairment, his family background, or his military service," and "[t]he decision not to investigate did not reflect reasonable professional judgment").

In addition, the scope of the duty to investigate mitigation evidence is substantially affected by the defendant's actions, statements, and instructions. As the Supreme Court explained in Strickland, the issue of what investigation decisions are reasonable "depends critically" on the defendant's instructions:

> The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information.

Strickland, 466 U.S. at 691, 104 S. Ct. at 2066.

In some cases, the defendant has given counsel information or made statements that indicate investigation into a particular area of mitigation evidence would be futile or a waste of time. See, e.g., Stewart v. Sec'y, Dep't of Corr., 476 F.3d 1193, 1210-11 (11th Cir. 2007) (denying claim of ineffective assistance of

49

trial counsel for failure to discover and inform defense mental health expert of defendant's childhood abuse and mistreatment because defendant never told his counsel about the abuse and mistreatment, and in fact "indicated just the opposite of poor treatment" (quotation marks omitted)); Henyard v. McDonough, 459 F.3d 1217, 1245 (11th Cir. 2006) (determining that counsel's failure to investigate or present evidence of defendant's childhood sexual abuse was not deficient performance because defendant repeatedly denied being sexually abused); Van Poyck v. Fla. Dep't of Corr., 290 F.3d 1318, 1324-25 (11th Cir. 2002) (concluding counsel was not ineffective for failing to investigate defendant's childhood and prison abuse because defendant told counsel he did not consider himself abused as a child and denied being raped in prison).

In other types of cases, the defendant has affirmatively instructed his counsel not to investigate or present mitigation evidence. In affirmative-instruction cases, the duty to investigate "does not include a requirement to disregard a mentally competent client's sincere and specific instructions about an area of defense and to obtain a court order in defiance of his wishes." Rutherford v. Crosby, 385 F.3d 1300, 1313 (11th Cir. 2004). A mentally competent defendant's instruction not to investigate or present mitigation evidence may make counsel's decision not to investigate or present mitigation evidence reasonable. See Blankenship v. Hall,

542 F.3d 1253, 1276-77 (11th Cir. 2008) (stating that even if counsel "did not know about Blankenship's background, however, another fact could make their failure to investigate reasonable: Blankenship himself instructed them not to contact his family"; "[s]ignificant deference is owed to failures to investigate made under a client's specific instructions not to involve his family"; and "[a]ssuming [counsel] did not know the details of his client's background, Blankenship's admonishment to [counsel] not to contact his family cannot be ignored"); Newland v. Hall, 527 F.3d 1162, 1202-05 (11th Cir. 2008), cert. denied, 129 S. Ct. 1336 (2009) ("We have . . . emphasized the importance of a mentally competent client's instructions in our analysis of defense counsel's investigative performance"; "when limited by his client's instructions not to contact his family or otherwise delve into his background, a reasonably competent attorney standing in Manning's shoes would have gone no further than Manning did to seek mitigating evidence from the client's past"; and "we follow the [Supreme] Court in drawing a distinction between a defendant's passive non-cooperation and his active instruction to counsel not to engage in certain conduct"); Johnston v. Singletary, 162 F.3d 630, 642 (11th Cir. 1998) (concluding counsel's failure to present expert mental health testimony at penalty phase was not unreasonable where counsel tried to have defendant evaluated but defendant "was steadfast in his resistance to meeting with

51

[the] expert"); Dobbs v. Turpin, 142 F.3d 1383, 1388 (11th Cir. 1998) ("[T]he decision whether to use mitigating evidence is for the client."); Hance v. Zant, 981 F.2d 1180, 1183-84 (11th Cir. 1993) (counsel's agreeing to capital defendant's wishes not to contact his family did not amount to ineffective assistance under the circumstances); Mitchell v. Kemp, 762 F.2d 886, 889-90 (11th Cir. 1985) (Counsel's investigation consisting of speaking with defendant and defendant's father held to be reasonable, when defendant did not provide any information about troubled childhood and told counsel to "leave [his family] out of it.").

This does not mean that a defendant's instructions as to investigation or presentation of mitigation evidence should be "blindly followed" where the defendant has a possible mental impairment or the defendant's instructions are not explicit or are less than clear. See Newland, 527 F.3d at 1208 ("We have cautioned that an attorney may not 'blindly follow' a client's instructions not to investigate or use mitigating evidence"; "[t]his principle especially holds true where a possible impairment prevents the client from exercising proper judgment" (quotation marks omitted)); Dobbs, 142 F.3d at 1387-88 (Counsel "Bennett testified . . . that Dobbs gave him the impression that he 'did not want to put up any evidence in mitigation'"; and counsel put up no mitigation evidence at all because counsel mistakenly believed that mitigation evidence was admissible only to

52

mitigate the crime and evidence of Dobbs's childhood was therefore inadmissible; counsel may not "blindly follow" defendant's commands); Blanco v. Singletary, 943 F.2d 1477, 1502 (11th Cir. 1991) (noting that counsel did not have a psychiatrist or psychologist examine Blanco, did no investigation at all before the penalty phase, never discussed any potential mitigation avenues with Blanco, and "had a greater obligation to investigate and analyze available mitigation evidence" because Blanco was, among other things, "noticeably morose and irrational," "depressed and unresponsive," and "uncommunicative and easily angered"); Thompson v. Wainwright, 787 F.2d 1447, 1451 (11th Cir. 1986) ("[Counsel] Solomon's explanation that he did not investigate potential mitigating evidence because of [defendant] Thompson's request is especially disturbing in this case where Solomon himself believed that Thompson had mental difficulties. An attorney has expanded duties when representing a client whose condition prevents him from exercising proper judgment.").

However, when a competent defendant clearly instructs counsel not to investigate or present mitigation evidence, the scope of counsel's duty to investigate is significantly more limited than in the ordinary case. See Knight v. Dugger, 863 F.2d 705, 750 (11th Cir. 1988) ("Although a capital defendant's stated desire not to use character witnesses does not negate the duty to investigate,

53

it limits the scope of the investigation required."); Tafero v. Wainwright, 796 F.2d 1314, 1320 (11th Cir. 1986) ("[A] defendant's decision communicated to his counsel as to who he wants to leave out of the investigation, while not negating the duty to investigate, does limit the scope of the investigation.").  Indeed, Strickland tells us that the reasonableness of counsel's investigation "depends critically" on the defendant's statements or actions.  Strickland, 466 U.S. at 691, 104 S. Ct. at 2066; see also Porter, slip op. at 11 (noting that "although Porter instructed [counsel] not to speak with Porter's ex-wife or son, Porter did not give him any other instructions limiting the witnesses he could interview").

Although the scope of counsel's duty is "limited," the extent of limitation cannot be reduced to mathematical certainty or a set of simple rules, for as the Supreme Court repeatedly has counseled, "[n]o particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant."  Van Hook, 130 S. Ct. at 16 (quoting Strickland, 466 U.S. at 688-89, 104 S. Ct. at 2065).  The touchstone of our inquiry into an attorney's performance, as always, is objective reasonableness under all the circumstances.  Id.; Strickland, 466 U.S. at 688-89, 104 S. Ct. at 2065.

A competent defendant's clear instruction not to investigate or present

mitigation evidence also impacts the prejudice prong of the ineffective assistance test.  In <u>Schriro v. Landrigan</u>, 550 U.S. 465, 127 S. Ct. 1933 (2007), the Supreme Court held that the capital defendant Landrigan could not demonstrate prejudice "[b]ecause the Arizona postconviction court reasonably determined that Landrigan instructed his attorney not to bring any mitigation to the attention of the [sentencing] court."  <u>Id.</u> at 477, 127 S. Ct. at 1941-42 (quotation marks and citations omitted); <u>see also id.</u> at 475, 127 S. Ct. at 1941 (stating that "[i]f Landrigan issued such an instruction [to his counsel not to offer any mitigating evidence], counsel's failure to investigate further could not have been prejudicial under <u>Strickland</u>").  Indeed, "the judge presiding on postconviction review was ideally situated to make [the] assessment [about what Landrigan instructed his counsel] because she is the same judge that sentenced Landrigan and discussed these issues with him."  <u>Id.</u> at 476, 127 S. Ct. at 1941. The Supreme Court emphasized that in denying Landrigan's § 2254 petition, the "District Court was entitled to conclude that regardless of what information counsel might have uncovered in his investigation, Landrigan would have interrupted and refused to allow his counsel to present any such evidence."  <u>Id.</u> at 477, 127 S. Ct. at 1942.

The <u>Landrigan</u> Court also observed that neither <u>Strickland</u>, nor <u>Wiggins</u>, nor

Rompilla[12] addressed an ineffective counsel claim where the defendant interfered with trial counsel's effort to present mitigating evidence:

> Neither Wiggins nor Strickland addresses a situation in which a client interferes with counsel's efforts to present mitigating evidence to a sentencing court. Wiggins, supra, at 523, 123 S. Ct. 2527 ("[W]e focus on whether the investigation supporting counsel's decision not to introduce mitigating evidence of Wiggins' background was itself reasonable" (emphasis added and deleted)). Indeed, we have never addressed a situation like this. In Rompilla v. Beard, 545 U.S. 374, 381, 125 S. Ct. 2456, 162 L. Ed.2d 360 (2005), on which the Court of Appeals also relied, the defendant refused to assist in the development of a mitigation case, but did not inform the court that he did not want mitigating evidence presented.

Id. at 478, 127 S. Ct. at 1942. The Supreme Court concluded that "at the time of the Arizona postconviction court's decision, it was not objectively unreasonable for that court to conclude that a defendant who refused to allow the presentation of any mitigating evidence could not establish Strickland prejudice based on his counsel's failure to investigate further possible mitigating evidence." Id. (emphasis added).

Our earlier decision in Gilreath v. Head, 234 F.3d 547 (11th Cir. 2000) is consistent with Landrigan. There, the defendant Gilreath instructed his counsel to

---

[12]See Rompilla v. Beard, 545 U.S. 374, 125 S. Ct. 2456 (2005). In Wiggins, there were no instructions or lack of cooperation by the defendant, and Wiggins focused on the reasonableness of the investigation that supported counsel's – not Wiggins's – decision not to present mitigation evidence. Wiggins, 539 U.S. at 523, 123 S. Ct. at 2536.

present no mitigation evidence during the penalty phase. Id. at 549-50.[13]  This

Court denied Gilreath's ineffective assistance claim on prejudice grounds, stating

Gilreath "actually must make two showings." Id. at 551.  "First, Petitioner must

show a reasonable probability that–if Petitioner had been advised more fully about

character evidence or if trial counsel had requested a continuance–Petitioner would

have authorized trial counsel to permit such evidence at sentencing." Id.  "Second,

Petitioner must establish that, if such evidence had been presented at sentencing, a

reasonable probability exists that the jury would have concluded that the balance of

aggravating and mitigating circumstances did not warrant death." Id. at 551-52

(quotation marks omitted).

In Gilreath, this Court explained that, "[i]n other words, to show prejudice,

Petitioner must show that – but for his counsel's supposedly unreasonable conduct

– helpful character evidence actually would have been heard by the jury.  If

Petitioner would have precluded its admission in any event, Petitioner was not

prejudiced by anything that trial counsel did." Id. at 551 n.12.  This rule follows

naturally from Strickland's formulation of the prejudice prong, for there cannot be

---

[13]Trial counsel had Gilreath execute a document memorializing his instruction not to present mitigation evidence, and stating Gilreath knew that three witnesses were standing by to testify about his alcoholism and mental condition but he did not want them to testify. Gilreath, 234 F.3d at 550.  Then, during the state habeas evidentiary hearing, Gilreath was asked whether additional discussion with trial counsel might have persuaded him to permit his counsel to present character witnesses during the penalty phase, and Gilreath said, "I would probably have said no." Id. at 552 n.13.

a reasonable probability of a different result if the defendant would have refused to permit the introduction of mitigation evidence in any event. See Strickland, 466 U.S. at 694, 104 S. Ct. at 2068 (defining prejudice for ineffective-assistance purposes as a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different").

We now apply these principles to Cummings's case.

## C.    Performance Prong

After considering the state court record as a whole, we conclude that the Florida state courts' decision – that Cummings had not proven that Mastos's investigation and presentation of mitigation evidence were deficient – was not contrary to, or an unreasonable application of, Strickland and its progeny. Multiple factors guide us to this conclusion.

First, and most significantly, Cummings was competent and clearly, consistently, and adamantly insisted that he wanted no mitigation evidence presented in the penalty phase. He issued this instruction before trial, when Mastos first broached the subject of mitigation with him. Cummings continued to hold that position during the January 4, 1993 pretrial hearing. When the state trial court explained to Cummings the purpose and benefits of mitigation evidence, Cummings responded that he would rather be dead than serve a life term in prison.

58

After the jury reached its guilty verdict, Cummings again objected when his sister addressed the court before the penalty phase began. Finally, according to his first postconviction counsel, Lee Weissenborn, Cummings even at the Rule 3.850 stage opined that he would rather have a death sentence than a sentence of life imprisonment, and refused to cooperate with the investigation or presentation of mitigation evidence. As discussed above, "[w]e have emphasized the importance of a mentally competent client's instructions in our analysis of defense counsel's investigative performance." Blankenship, 542 F.3d at 1277 (quoting Newland, 527 F.3d at 1202) (ellipsis omitted); see Rutherford, 385 F.3d at 1313-14. Cummings's clear, affirmative instructions as to the penalty phase made Mastos's conduct objectively reasonable in this case.

Second, Mastos's conduct does not fit the category of blindly following a client's wishes. Rather, Mastos explained the purpose of mitigation evidence to Cummings and had Cummings evaluated by a psychiatrist. Mastos testified that he first began preparations for the penalty phase months before Cummings's trial began. But Cummings hindered his efforts. Mastos testified that Cummings was "very guarded" about his family and his background. Mastos explained why he needed to obtain mitigation evidence, but Cummings refused to provide Mastos with mitigation-related information. See Blankenship, 542 F.3d at 1276 ("[T]he

59

petitioner is often in the best position to inform his counsel of salient facts relevant to his defense, such as his background."); Newland, 527 F.3d at 1202 ("In evaluating the reasonableness of a defense attorney's investigation, we weigh heavily the information provided by the defendant."); Rutherford, 385 F.3d at 1312 ("To the extent there were any shortcomings in the investigation of Rutherford's family life, he is responsible for them. He did his best to hinder his attorneys' efforts.").

Mastos also petitioned the state trial court for a colloquy, in which the state trial court supplemented Mastos's efforts to explain the purpose of mitigation evidence with the court's own explanations and exhortations. Both Mastos and the state trial court explained to Cummings what the penalty phase was for and why there was "no down side risk" to presenting mitigation evidence. Cummings still refused. Cummings indicated he understood, but did not want mitigation because he preferred the death penalty to life in prison. Although Mastos saw no external reason to doubt Cummings's mental ability to make the decision not to present mitigating evidence, Mastos nevertheless moved for a competency evaluation to be sure.

Mastos then received the report from Dr. Jacobson, a psychiatrist at the University of Miami School of Medicine, which relayed that Cummings stated he

had a good relationship with his "mother and siblings," and that Cummings denied having a drug problem. Dr. Jacobson reported that Cummings denied prior psychiatric consultation on an outpatient basis, any inpatient treatment, any operations or serious injuries. According to Dr. Jacobson, Cummings was "well organized in his thinking" and "expressed himself in a goal directed fashion." There were no delusions or hallucinations, and Cummings's mood was not depressed. Dr. Jacobson also reported that Cummings "stated he did not want family members to testify" and "[w]hen asked to explain he told me that there was no difference between life imprisonment and a death sentence because if he was in jail for the rest of his life he was lost to his family."[14]

The record also reflects that Mastos reviewed Cummings's North Carolina prison records (which contained certain non-public medical records) and they did not contain any information he wanted to present as mitigation. Mastos told the state trial court that "there is no evidence whatsoever of any psychoses or psychological problems that would affect a person's behavior" and "there is nothing in there that I can use." During the Rule 3.850 hearing, Mastos reiterated "there was nothing [in Cummings's prison file] that was going to help him." The

---

[14]Dr. Jacobson's report states Cummings claimed "that the victim was a girlfriend but that they had no children together although he has five children with whom he describes an active role in their upbringing."

prison file actually contained damaging evidence of Cummings's participation in five violent incidents while in custody, and Mastos successfully kept that evidence out of the penalty phase. Thus, although Mastos subsequently did not retain an investigator or subsequently conduct any investigation, Mastos did have both Dr. Jacobson's report and the North Carolina prison records, which contained a significant amount of information about Cummings.

Third, the information Cummings did give to Dr. Jacobson and, in turn, to Mastos, indicated Cummings had no drug problem, no prior psychiatric treatment, no operations or serious injuries, and no depression. Cummings's disavowment of such problems suggested investigation in those areas was not necessarily required. See Strickland, 466 U.S. at 691, 104 S. Ct. at 2066 (stating that the reasonableness of counsel's investigation decisions "depends critically" on information furnished by the defendant, and that "when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable"). Compare Porter, slip op. at 10 (noting that counsel ignored "[t]he court-ordered competency evaluations . . . [which] reported Porter's very few years of regular school, his military service and wounds sustained in combat, and his father's 'over-disciplin[e]'"), with Van Hook, 130 S. Ct. at 18-19 (concluding

62

counsel's performance was not deficient when counsel gathered a substantial

amount of information and then made a reasonable decision not to pursue

additional sources).

Fourth, Mastos ultimately made the tactical choice to abide by Cummings's

instructions regarding mitigation evidence, in part to maintain the trust that existed

between himself and Cummings. Mastos's interest in maintaining attorney-client

trust was particularly critical because Cummings had asked the state trial court to

discharge Mastos during the January 4, 1993 pretrial hearing. At the Rule 3.850

hearing, Mastos testified that Cummings sought to have Mastos discharged

because Cummings viewed even the decision to have him evaluated for

competency (as to Cummings's refusal to have mitigation evidence presented) as a

violation of trust.[15] And with the trial looming, Mastos needed Cummings's

cooperation and trust in the guilt phase. Although Mastos's decision was to not

"go behind [Cummings's] back" to conduct an investigation, Mastos did suggest to

---

[15]Mastos testified as follows:
In fact, if you review . . . the transcript, there is only one occasion where he says I want to fire Mr. Mastos. That occurred at the moment that I asked the court to have him evaluated. At that moment, by taking that step, I lost his trust. And he turned on me very, very quickly because he viewed my requesting that as a violation of the trust. . . . [I]n reading this transcript, he showed something there that perhaps will explain the relationship that we had. . . . [Cummings] treated that [Mastos's decision to seek a competency evaluation] and considered that extremely disloyal to him. That – so knowing that and his reaction, you can understand why I did not launch some independent investigation behind his back . . . .

63

Cummings (again) that he have his family members contact Mastos (a suggestion the state trial court echoed on the record at the pretrial hearing). The family members did not contact Mastos. During the trial Cummings's two sisters attended and Mastos talked to them before they testified.

Relatedly, Mastos testified that Cummings's insistence on his innocence, even after the jury returned its guilty verdict, boxed him in as to what strategies he could employ at the penalty phase in any event:

> Q. . . . Did your discussions with [Cummings's sisters] give you any material, any information that you could have used in a penalty phase?
> A. No.
> Q. . . . Did you remember discussing with the defendant, [did he] give you any background material, any material that you thought you might have been able to use at a penalty phase?
> A. No. [Cummings] was always very guarded about his background and his family.
> Q. Did his position, [as] regards the penalty phase, change any following the guilty verdict?
> A. Well, grudgingly, he let me put these two people [the sisters] on for the limited . . . goal of trying to put a human spin on this case as to why the jury might spare his life.
> . . .
> Q. Do you recall what defense you did present at the penalty phase?
> A. Very limited. And again, it was limited to trying to put some sort of a human side to this, that Fred did have a family, that he did have some children out there. That was basically all that I could do, you know, in the limited framework that he had put on this thing.

Mastos explained that this "limited framework" was built in part on Cummings's

64

continued insistence that he was innocent of the crime. Mastos therefore chose to "put a human spin" on Cummings's life as his best option. In fact, the two sisters testified that Cummings had four children who were present in the courtroom; that he had eleven half-siblings; that his family loved him; that he tried to be a good father; and that he treated his family well and was close to them. They also testified that Cummings was honest and was not a violent man.

Although at the January 4, 1993 pretrial hearing Cummings said Mastos could talk to his family members, Cummings in the same breath reiterated he did not want his family testifying or such evidence presented. As Mastos testified, Cummings insisted he was innocent and, whatever the outcome, he did not want his family members testifying.

At the pretrial hearing, Cummings further explained that he did not want mitigation evidence presented because he had no interest in what it could potentially earn him – a life in prison:

> THE DEFENDANT: What's the difference between a life sentence and death? I'm not guilty. There's no difference. You know, I'm not going – I am not going to sit in no prison for something I didn't do the rest of my life. I might as well be dead if you find me guilty of something I'm not guilty for.
> So I'm not going [to] have my family beg for my life to take care of me for $15 a month. You know, I have children out there. I'm not going to have them begging for my life.
> . . .
> THE COURT: . . . [T]here's very little down side risk for you if you

65

are found guilty and your family came in. They wouldn't be begging people. They would be questioned by your lawyer about you as a human being, as a father, as a brother, as a son, as a person, so the jury has a better idea of who you are and what's happened to you during your life. But this is not a begging that goes on. It's a matter of information for those 12 people.

THE DEFENDANT: You know, I understand fully what you are saying. But when you're locked up and you have children . . . . When these kids get big I'm sitting in prison with a life sentence. What can I do for them? What can I provide for them? What are they going to say, my daddy is in prison? I rather they say my father is dead. What is the difference? What can I do for my child[?] . . . That's torture.

Cummings maintained this view after the guilty verdict was reached, when he interrupted the start of the penalty-phase proceedings to object to his sister addressing the court. Only after the state trial court ordered that some family testimony would be presented for the court's benefit despite Cummings's objection did Cummings relent grudgingly to his two sisters testifying.

Fifth, Mastos was an experienced attorney. At the time of Cummings's trial, Mastos was a veteran criminal defense lawyer who already had represented two capital co-defendants who were acquitted. He also had served as a state court judge and presided over thousands of cases, including capital murder trials. All told, Mastos had served ten years as a judge and an additional seventeen years as either a prosecutor or a criminal defense lawyer. "When courts are examining the performance of an experienced trial counsel, the presumption that his conduct was reasonable is even stronger." Chandler, 218 F.3d at 1316. At a minimum,

66

Cummings has not shown that Mastos's conduct – obtaining a competency evaluation of Cummings, abiding by his competent client's clear instructions, and not going behind Cummings's back to investigate his family and personal background – was objectively unreasonable under professional norms prevailing at the time of Cummings's 1993 trial. See Van Hook, 130 S. Ct. at 16 (defining "effective assistance of counsel" for Sixth Amendment purposes as "representation that does not fall below an objective standard of reasonableness in light of . . . the professional norms prevailing when the representation took place" (quotation marks omitted)).

Sixth, and alternatively, even if Cummings had not objected to the investigation and presentation of mitigation evidence, and even if Mastos had the proposed 3.850 mitigation evidence, Cummings has not shown that competent counsel would have necessarily presented that evidence. For example, Mastos testified that he would not have presented evidence of Cummings's drug use, his family's criminal history, or his antisocial personality disorder not only because it was inconsistent with his chosen penalty-phase strategy, but also because it would have had a negative effect on the jury:

> Q. If you had requested a mental examination and the examination showed that the defendant had an Antisocial Personality Disorder, with the suggestion that the defendant was a psychopathic manipulator, is that something that you would

67

have wanted the jury to hear?

A. No.

Q. Why not?

A. That would make a bad situation worse.

Q. In what respect?

A. Well, it would defeat what I was trying to do, that is, put a human spin on it, [to show] that he's a human being with a family. If they heard testimony that he was a manipulative sociopath, I mean, you might as well throw gasoline on a fire.

Q. Okay. If . . . the defendant came from a family of criminals, [or] the defendant himself had participated in criminal behavior of one sort [or] another nearly his entire life, would you have presented that to a jury?

A. No.

Q. And why not?

A. Again, adverse effect on the jury. You're trying to redeem the guy. You're trying to show good qualities. You show a life dedicated to crime, it's negative.

Q. Okay. What about alleged drug use by the defendant, . . . lifelong drug use?

A. Well, drug use is like alcohol. That sometimes can cut both ways. You know, it certainly could help . . . [if] this [crime] was caused by cocaine rage or frenzy.

Q. Well, let me ask you this then. Drug abuse, drug use at a time other than the time of the crime, would that have been of any use to you?

A. Probably very little.

Q. In the absence of the –

A. Jurors are not sympathetic to junkies generally.

Regarding Cummings's family's criminal history, Mastos reiterated his belief that if "[t]he jury hears a violent felony . . . takes place and then to bring in front of the jury that his whole family has a criminal history would be completely counterproductive . . . [b]ecause, instead of voting eight to four, they would have

voted ten to two or twelve zip because they would have said, my God, the whole family is garbage." Cummings has neither rebutted this testimony nor challenged its underlying assumptions regarding the damaging nature of the proposed 3.850 mitigation evidence. Therefore, Cummings cannot show deficient performance because he has not demonstrated that competent counsel would have necessarily presented the Rule 3.850 mitigation evidence. Stated another way, Cummings has not shown it was objectively unreasonable for counsel to omit the 3.850 evidence.

Under the total circumstances in this case, we conclude the Florida state courts' decision – that Mastos's performance was not deficient at to the investigation and presentation of mitigation evidence – was not contrary to, or an unreasonable application of, established federal law.

**D. Prejudice Prong**

Even if Cummings could show that Mastos's performance was deficient, he still must establish that such deficient performance prejudiced him. The Florida Supreme Court found that Cummings did not meet his prejudice burden, as Cummings "failed to establish that the outcome of his case would have been different had trial counsel presented the proposed mitigating evidence." Cummings II, 863 So. 2d at 253. We also conclude that the Florida Supreme Court's finding of no prejudice was not contrary to, or an unreasonable application

69

of, established federal law. Three reasons support our conclusion.

First, Cummings has not shown that he would have consented to presenting the mitigating evidence adduced at the Rule 3.850 evidentiary hearing even if Mastos had investigated, discovered it, and counseled him to present it. As discussed above, <u>Landrigan</u> states that a defendant cannot show prejudice under <u>Strickland</u> if the defendant would not have permitted his counsel to present mitigating evidence at trial. <u>Landrigan</u>, 550 U.S. at 476-78, 127 S. Ct. at 1941-42; see also <u>Gilreath</u>, 234 F.3d at 551 ("Petitioner must show a reasonable probability that–if Petitioner had been advised more fully about character evidence or if trial counsel had requested a continuance–Petitioner would have authorized trial counsel to permit such evidence at sentencing.").

Cummings has never testified he would have allowed his counsel to present the Rule 3.850 information at his trial. In fact, he did not testify at all during the Rule 3.850 hearing. Rather, Cummings consistently opposed the presentation of mitigating evidence at his trial. Cummings told Mastos and the state trial court repeatedly that he did not want a penalty-phase presentation, and he interrupted with an objection when one of his sisters (after the guilty verdict) tried to address the state trial court on her own. Only after the state trial court ruled that it would hear some family testimony regardless of Cummings's opposition did Cummings

grudgingly relent, and then, according to Mastos, Cummings relented only enough

for Mastos to put a "human spin" on the case by showing Cummings had a family

who loved him. And, Cummings's statements to the state trial court and Dr.

Jacobson make clear that he preferred a sentence of death to one of life

imprisonment, further indicating Cummings would not have consented to the

presentation of mitigating evidence whose only purpose was to convince the jury

to recommend life instead of death.

Second, as discussed earlier with respect to Mastos's performance, Mastos

testified that he would not have presented the proposed mitigation evidence in any

event, and Cummings has not shown that competent counsel would have

necessarily presented it. Thus, Cummings has not established prejudice. See

Wong v. Belmontes, 558 U.S. —, 130 S. Ct. 383, 386 (2009) (stating that prejudice

prong requires the petitioner "to establish a reasonable probability that a competent

attorney, aware of the available mitigating evidence, would have introduced it at

sentencing" (quotation marks and brackets omitted)); see also Gilreath, 234 F.3d at

551 n.12 ("[T]o show prejudice, Petitioner must show that . . . helpful character

evidence actually would have been heard by the jury.").

Third, Cummings cannot satisfy Strickland's prejudice requirement because

even if the jury had heard the mitigating evidence adduced at the Rule 3.850

71

evidentiary hearing, Cummings has not shown "that but for his counsel's deficiency, there is a reasonable probability he would have received a different sentence." Porter, slip. op. at 11. As the Supreme Court recently reiterated, "To assess that probability, we consider 'the totality of the available mitigation evidence – both that adduced at trial, and the evidence adduced in the habeas proceeding' – and 'reweig[h] it against the evidence in aggravation.'" Id. (quoting Williams v. Taylor, 529 U.S. at 397-98, 120 S. Ct. at 1515).

Following Cummings's trial, the state trial court found four statutory aggravating circumstances: (1) Cummings had three prior convictions for violent felonies; (2) Cummings committed the murder in the course of a burglary; (3) the murder was especially heinous, atrocious, or cruel; and (4) Cummings committed the murder in a cold, calculated, and premeditated manner. Although Cummings had been incarcerated several times for prior violent felonies, and although Good had obtained a restraining order against him, Cummings waited outside her home and then brutally stabbed her in her own bed while she lay sleeping beside her eight-year-old son. Given the strength of the four aggravating circumstances, the proposed mitigation evidence must be strong enough to outweigh them, and therefore to raise a reasonable probability that the balance of aggravating and mitigating circumstances did not warrant death. See Parker v. Sec'y for the Dep't

72

of Corr., 331 F.3d 764, 788-89 (11th Cir. 2003) ("Given the strength of the aggravating factors and the relative weakness of the mitigating evidence Parker argues should have been presented, there is no reasonable probability that, absent the deficient performance, the outcome of the proceedings would have been different. The aggravating factors in this case are substantial."). "Moreover, we have rejected prejudice arguments where mitigation evidence was a 'two-edged sword' or would have opened the door to damaging evidence." Wood v. Allen, 542 F.3d 1281, 1313 (11th Cir. 2008), cert. granted, 129 S. Ct. 2389 (2009) (citing Gaskin v. Sec'y, Dep't of Corr., 494 F.3d 997, 1004 (11th Cir. 2007); Grayson v. Thompson, 257 F.3d 1194, 1227 (11th Cir. 2001)); see Wong, 130 S. Ct. at 387-90 (finding no prejudice where proposed mitigation evidence was either cumulative of evidence already presented at penalty phase, or would have opened door to damaging testimony).

Here, the proposed mitigating evidence is either cumulative or damaging to Cummings. The mitigating evidence, adduced either at trial or at the Rule 3.850 hearing, falls into the four basic categories of Cummings's: (1) personal/family background; (2) history of drug abuse; (3) relationship with his children; and (4) mental health. Much of the personal/family background testimony, and all of the testimony about Cummings's relationship with his children, duplicated what was

said by Cummings's sisters – Covington and St. Fleur – at the penalty phase. For instance, the sisters testified that Cummings had eleven half-siblings; that he belonged to a loving and supportive family; and that he loved his children, treated them well, and took care of them when he was not in prison.

As to drug abuse and mental health evidence, the penalty phase did not feature this testimony. The drug use evidence – that Cummings began using drugs when he was about twelve or thirteen, that he huffed gasoline for about a month, and that as an adult Cummings smoked crack cocaine – was of a general nature, not tied to the circumstances of this crime.[16] In such circumstances, we have recognized that "presenting evidence of a defendant's drug addiction to a jury is often a 'two-edged sword': while providing a mitigating factor, such details may alienate the jury and offer little reason to lessen the sentence." Pace v. McNeil, 556 F.3d 1211, 1224 (11th Cir.), cert. denied, 130 S. Ct. 190 (2009); see Tompkins v. Moore, 193 F.3d 1327, 1338 (11th Cir. 1999) ("[A] showing of alcohol and drug abuse . . . can harm a capital defendant as easily as it can help him at sentencing.").

As to mental health evidence, Cummings's expert testimony largely echoed that of the State's experts: he had antisocial personality disorder. The State's two

---

[16]Indeed, throughout both the guilt and penalty phases of the trial, Cummings claimed to Mastos that he was not present at the crime and was misidentified. Cummings also told Dr. Jacobson that he had no drug problem. Mastos had no way to tie Cummings's drug use to the crime.

74

experts testified that Cummings had no brain damage, and even Cummings's experts could not diagnose any brain damage with any degree of certainty. After hearing all expert testimony, the Rule 3.850 court found that the testimony of the State's experts – particularly Dr. Ansley, who testified Cummings had antisocial personality disorder and no brain damage – was more credible than that of Cummings's experts. This finding, which the Florida Supreme Court affirmed, see Cummings II, 863 So. 2d at 252-53, was reasonable and supported by the record. In fact, even Cummings's mental health experts admitted that Cummings knew his conduct was wrong and that Cummings was not impaired in his everyday functioning. Thus, in the mental health area, Cummings is left mainly with a diagnosis of antisocial personality disorder, which is not mitigating but damaging. See Land v. Allen, 573 F.3d 1211, 1222 (11th Cir. 2009) (noting defendant Land's mental health expert testified Land "met the criteria for an antisocial personality disorder," then stating Land's "history of deception and criminality, which . . . were an integral part of [the expert's] diagnosis, substantially undercuts any potential benefit her mitigation testimony might have had"); Parker, 331 F.3d at 788 ("Counsel decided not to put Dr. Stillman on the stand because Dr. Stillman had opined that Parker was antisocial and a sociopath, a diagnosis the jury might not consider mitigating. . . . Counsel cannot be deemed deficient in failing to call a

75

witness whose testimony is of such limited value."); Clisby v. State of Ala., 26 F.3d 1054, 1056 & n.2 (11th Cir. 1994) (rejecting ineffective assistance claim on prejudice grounds because mental health expert's testimony would not have changed the result, noting that "[s]entencing courts need no experts to explain that 'antisocial' people–people who by common definition have little respect for social norms or the rights of others–tend to misbehave if they abuse drugs and alcohol" and "[i]t has been estimated that 91% of the 'criminal element' are 'antisocial' personality types"); Weeks v. Jones, 26 F.3d 1030, 1035 n.4 (11th Cir. 1994) (stating antisocial personality disorder is "not . . . mitigating as a matter of law").

There was some new 3.850 evidence about Cummings's childhood in that his mother never married, did not work much, was frequently out playing cards, and beat Cummings (and her other children) with belts and extension cords when they misbehaved. Cummings was beaten up to twenty times over the course of about twelve years. Cummings also grew up in a neighborhood with drugs and criminal activity; five siblings used drugs; and almost all of Cummings's siblings had been arrested. At the time of the Rule 3.850 evidentiary hearing, only three of the twelve children were alive and not incarcerated. Cummings presented no discipline problems in school and was a pleasant and friendly child.

Nonetheless, the mitigating nature of Cummings's proposed penalty-phase

76

evidence was weak and would have been wholly offset by the double-edged nature of some of that testimony, such as Cummings's drug use and the extensive criminal history of his family. Moreover, had Mastos tried to put on this evidence, he would have opened the door to damaging testimony. Presenting testimony as to Cummings's alleged psychological problems from his childhood and good behavior in school would have opened the door to a strong rebuttal by the State that would have included, at a minimum, (1) the evidence from Cummings's North Carolina prison file of Cummings's repeated involvement in violent incidents while in prison, (2) details of his three prior violent felony convictions, and (3) considerable expert testimony as to Cummings's antisocial personality disorder. See Wong, 130 S. Ct. at 389 (recognizing that "heavyhanded," "more-evidence-is-better" attempt to portray defendant in positive light can invite strong negative evidence in rebuttal). As Mastos himself testified, this would have wholly undermined Mastos's successful strategies of keeping the prison disciplinary record out of the case, emphasizing Cummings's humanity, and portraying his family as close, loving, and supportive of one another. Furthermore, Cummings was 33 years old when he murdered Good, and the State would have stressed that his childhood was many years behind him. Accordingly, even had this 3.850 evidence been presented, there is no reasonable probability of a different result.

Cummings has not shown the required prejudice from Mastos's penalty-phase performance.

## IV.  CONCLUSION

For the reasons set forth above, we reverse the district court's grant of a writ of habeas corpus to Cummings on his claim of ineffective assistance in the investigation and presentation of mitigation evidence in the penalty phase.  We affirm the district court's denial of the remaining claims in Cummings's § 2254 petition.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**