[DO NOT PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 23-11589

_____

DONALD E DEARDORFF,

Petitioner-Appellant,

*versus*

WARDEN,

Respondent-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Alabama
D.C. Docket No. 1:17-cv-00450-JB-MU

_____

Before JILL PRYOR, BRANCH, and ABUDU, Circuit Judges.

PER CURIAM:

Donald Deardorff is an Alabama death-row inmate whom a jury found guilty of, among other charges, three counts of capital murder for the death of his commercial landlord, Ted Turner. Following a direct appeal and state postconviction proceedings, Deardorff filed a counseled 28 U.S.C. § 2254 habeas corpus petition, in which he argued that his trial counsel provided ineffective assistance. The district court granted Deardorff a certificate of appealability ("COA") on the issue of whether his counsel rendered ineffective assistance during the penalty phase of his trial by failing to locate and present mitigation evidence and failing to prepare the witnesses called. This Court subsequently expanded the COA to include the issue of whether Deardorff's trial counsel was ineffective for failing to object, on Confrontation Clause grounds, to the admission of statements contained in the codicil of Turner's will during the guilt phase of his trial. After thorough review, and with the benefit of oral argument, we affirm the district court's denial of habeas relief.

## I.    FACTUAL BACKGROUND

In March 2000, a state grand jury indicted Deardorff on 23 counts, including counts of capital murder for Turner's death. Deardorff's trial began in September 2001, and the facts established at trial, as recited by the Alabama Court of Criminal Appeals ("ACCA") from Deardorff's direct appeal, are as follows.

Turner was a local minister, businessman, and father who leased a storage warehouse to Deardorff and his girlfriend, Christy Andrews, in 1998. *Deardorff v. State*, 6 So. 3d 1205, 1211 (Ala. Crim. App. 2004) ("*Deardorff I*"), *aff'd sub nom. Ex parte Deardorff*, 6 So. 3d 1235 (Ala. 2008) ("*Deardorff II*"). At some point, Deardorff stopped making rent payments for the warehouse, and Turner pursued legal action against him. *Id.* Deardorff and Andrews were evicted and had a default judgment entered against them for a little over $3,000. *Id.*

During this time, Turner reaffirmed a will he had recently executed in preparation for a trip abroad. *Id.* In his reaffirmation, found on his kitchen table following his disappearance, Turner in red ink wrote the following: "Reaffirmed 7/27/99 just in case Don Deardorff is really crazy." *Id.*

According to Deardorff's codefendant, Millard Peacock, Deardorff was very angry with Turner for initiating legal action against him. *Id.* Peacock testified that Deardorff said he planned to rob Turner to "get even" and that he wanted to kill Turner. *Id.* In September 1999, Deardorff and Peacock entered Turner's home and waited for his arrival. *Id.* When Turner returned home, Deardorff threatened him with a handgun, and he and Peacock bound Turner's hands with duct tape and placed him in a closet. *Id.* at 1211-12. Deardorff left Turner's home for the evening while Peacock stayed behind, letting Turner out of the closet to use the restroom, and ultimately untying his hands. *Id.* at 1212.

When Deardorff returned to Turner's home the next day, Deardorff forced Turner to write a personal check for $4,000. *Id.* Peacock then drove Turner's car to a local bank to cash the check for Deardorff. *Id.* When Peacock returned to Turner's home, he witnessed Deardorff force Turner to write out four more checks for a total of almost $18,000. *Id.* Peacock again went to a bank to cash the checks, but the bank refused, prompting Peacock to deposit the money in his bank account instead. *Id.*

Peacock returned to Turner's home and informed Deardorff he could not cash the additional checks. *Id.* The two remained in Turner's home for the rest of the day, where they watched television and ordered food with Turner's money. *Id.* Deardorff also used Turner's money to order car parts online and visit many pornographic websites. *Id.* Turner remained in the closet the entire time. *Id.*

The following day, Deardorff informed Turner that they were taking him to a park to leave him on a park bench, and once they left, Turner would be able to call for help. *Id.* Deardorff and Peacock duct-taped Turner's hands and mouth and taped a pillowcase over his head. *Id.* Deardorff then drove himself, Turner, and Peacock to a logging road. *Id.* Deardorff and Peacock removed Turner from the car and walked him to the end of the logging road, then Deardorff took Turner deeper into the woods where he forced Turner to kneel on the ground. *Id.* at 1212-13. Deardorff shot Turner in the head four times, killing him. *Id.* at 1213.

After a few days on the run together, Peacock and Deardorff split up Turner's money that Peacock had previously deposited into his account, and they parted ways. *Id.* Deardorff was ultimately apprehended during a traffic stop. *Id.* A search of the vehicle Deardorff was in produced $18,900 in cash, pornographic videotapes, and paperwork related to Internet orders for automobile parts placed in Turner's name with his credit cards.[1] *Id.*

Upon Deardorff's arrival at the police station, Deardorff overheard officers talking about the money and weapon found in the vehicle, and Deardorff stated, "the gig is up." *Id.* When officers questioned him about that statement, Deardorff said, "[T]ake the death penalty off the table and I'll tell you." *Id.* at 1214 (alteration in original). Ultimately, Deardorff placed the blame on Peacock. *Id.* A few days later, officers arrested Peacock, who placed the blame on Deardorff and agreed to fully cooperate in the investigation, and Peacock later led officers to Turner's remains. *Id.*

Thereafter, Andrews consented to a search of her and Deardorff's storage unit. *Id.* Inside, officers found items taken from Turner's home, including a roll of duct tape that had been forensically matched to the duct tape used to bind Turner, a pair of Turner's binoculars, and two cameras Turner's neighbors had recently loaned to him. *Id.*

---

[1] The police search also uncovered a .38 caliber handgun, which was the same type of gun used to kill Turner. However, the weapon found during the vehicle search was excluded as the murder weapon.

Trial evidence also showed the following. Regarding Turner's will, during opening statements, the state explained to the jury that Turner wrote a will before his death which included a notation about Deardorff, stating, "[j]ust in case he is as crazy as I think." During trial, the state referenced this will many times. First, one of Turner's friends testified that she had witnessed Turner create the will, and she did not recognize the red writing at the bottom of the will, although she recognized that the writing matched Turner's handwriting. The will was then placed into evidence without objection from Deardorff's attorney. The state produced an enlarged version of the will as a demonstrative aid for the jury, which was also introduced into evidence without objection.

Next, Turner's daughter testified about Turner's will. She stated that, after realizing her father was missing, she entered his home and discovered the will on the kitchen table. The will worried her, specifically, the red writing at the bottom of the will that stated Turner was reaffirming his will "just in case Don Deardorff was crazy." She stated that she turned the will over to the police. Turner's son-in-law also testified about Turner's will, explaining that it made him suspect Deardorff as someone who may have had something to do with Turner's disappearance.

Finally, Federal Bureau of Investigation Special Agent Thomas Montgomery ("Agent Montgomery") testified about Turner's will. He stated that he learned about Turner's will while, after receiving information from Turner's daughter, he assisted in the investigation of Turner's disappearance. Turner's daughter

23-11589                 Opinion of the Court                        7

informed Agent Montgomery about a boyfriend-girlfriend duo her father had to evict from a warehouse, but she did not know their names.  Then she provided Agent Montgomery with Turner's will, which "identified that [Turner] apparently was concerned" about Deardorff.  With this information, law enforcement began further investigations.  In later re-direct examinations, Agent Montgomery explained the significance of Turner's writing on his will, noting that the writing was dated around the same time that Turner sued Deardorff.  He explained that the lawsuit demonstrated that there could have been "an issue that had occurred or an occurrence be-tween" Deardorff and Turner, which was a "potential source of conflict or a reason one might have a grudge against the other."  He stated that Turner's writings further indicated that Turner had "concern" toward Deardorff.  At no point during any witnesses' testimony about the will did Deardorff's counsel object.

Following the presentation of evidence from both parties, the state gave its closing argument. The state referenced Turner's will, stating the following:

> Early in the case, Deardorff surfaced.  And it didn't surface from some snitch.  It didn't surface from some drug dealer in Miami, Florida.  It didn't surface from some thug out in the county, or it didn't surface from some witness [the prosecutor] generated. It surfaced from Ted Turner.  He named the man he thought might do evil to him.  And I submit to you that's what he has left in his will and why he left it. "Just in case Donald Deardorff is as crazy as I think he is."  That's a message.  That's the man I fear.  It was

so significant to him that he put it down.  And, ladies and gentlemen of the jury, he didn't just put it down, he wrote it in red.  You can't miss it.  It's designed so you can't miss it.

In his closing arguments, Deardorff asserted to the jury that Peacock was the individual responsible for killing Turner, not himself.  Deardorff made clear that his defense hinged on discrediting Peacock's statements to police and directing the jury to consider Peacock as Turner's sole killer.  The trial court then charged the jury, explaining that the jury should base the verdict "solely on the evidence in this case which comes from witnesses' testimony and any exhibits that are admitted into evidence," and not "arguments of the lawyers."  Deardorff did not request, nor did the trial court give, a limiting instruction about the considerations of Turner's will.  Ultimately, the jury found Deardorff guilty of three counts of capital murder.[2]

Following the verdict, the parties entered the penalty phase of trial.  The state did not present any additional evidence during the penalty phase, resting on the evidence it presented at trial to establish aggravating circumstances.  It argued to the jury that the

---

[2] The jury also found Deardorff guilty of six counts of first-degree theft, one count of theft in the second degree, and one count of receiving stolen property in the second degree.  The ACCA vacated Deardorff's convictions and sentences for the theft counts, holding that the convictions violated Deardorff's double jeopardy rights.  *Deardorff I*, 6 So. 3d at 1215, 1234.  Thus, the ACCA remanded the case to the trial court for the limited purpose of vacating those convictions and sentences, but it kept Deardorff's death sentence intact.  *Id*.

following aggravating circumstances existed: (1) the capital offense was committed while Deardorff was engaged in, or an accomplice in, the commission of, or an attempt to commit, a robbery, kidnapping, or burglary; and (2) the capital offense was especially heinous, atrocious, or cruel compared to other capital offenses.

In mitigation, Deardorff submitted two witnesses—his mother and himself. His mother testified that Deardorff grew up as a "normal boy," until he entered the military, where she believed his personality changed. She stated her belief that Deardorff was innocent and that he was capable of loving and caring for others. Deardorff testified through narrative format, reiterating that he was innocent of all charges.

Following deliberations, the jury voted 10-2 in favor of imposing the death penalty. The trial court found the two aggravating circumstances put forth by the state existed. It also found that no statutory mitigating circumstances existed, but it noted that it had considered the non-statutory mitigating circumstances presented by Deardorff and his mother. Ultimately, the trial court ruled that, in consideration of all the circumstances, the evidence was sufficient to uphold the jury's death penalty recommendation, and it sentenced Deardorff to death on the three counts of capital murder.

## II.    PROCEDURAL HISTORY

Following his convictions, Deardorff directly appealed to the ACCA, which affirmed Deardorff's murder convictions and death sentence. *Deardorff I*, 6 So.3d at 1234. Following his petition to the

Alabama Supreme Court ("ASC") for a writ of certiorari, the ASC also affirmed Deardorff's death sentence. *Deardorff II*, 6 So. 3d at 1245. Deardorff petitioned the Supreme Court of the United States for a writ of certiorari, which the Court denied. *Deardorff v. Alabama*, 556 U.S. 1186 (2009) (mem.).

In October 2009, Deardorff timely filed a petition for post-conviction relief pursuant to Alabama Rule of Criminal Procedure 32, which he later amended. In his amended Rule 32 petition, Deardorff argued, among other things, that his trial counsel performed ineffectively by failing to: (1) challenge the admission of Turner's will on Sixth Amendment grounds, and (2) investigate mitigation evidence or adequately prepare the mitigation witnesses called. To his mitigation claim, he contended his trial counsel failed to obtain a professional psychological examination and failed to conduct an adequate mitigation investigation. He argued that trial counsel hired an unqualified mitigation investigator who conducted perfunctory interviews with Deardorff's family and friends, as evidenced by the investigator's letter that stated he was discontinuing his efforts after a single day of attempting witness interviews. The investigator explained that he attempted to speak to Deardorff's mother and father, to no avail. Instead of attempting additional investigation themselves, Deardorff's counsel instead performed no other mitigation investigation. Deardorff argued that, due to this poor investigation, the jury did not hear evidence regarding the adverse experiences he faced during his developmental years, the familial turmoil he witnessed, and the impact that those events had on his mental health.

The state court summarily dismissed many of Deardorff's claims, including his claim related to Turner's will.  However, it held an evidentiary hearing on Deardorff's remaining claims, including the one related to counsel's mitigation investigation and presentation.  There, Deardorff's lead trial counsel testified, noting he had been practicing law for 33 years and his practice was 60% criminal defense work.  He had tried seven capital cases during his career and at least twenty homicide cases, and Deardorff's case was not his first death case.  He confirmed that he did not hire any mental health experts to examine Deardorff, but recalled speaking to members of Deardorff's family and he did not believe mental health was an issue in the case.  He also stated he hired a mitigation investigator, and he recalled that Deardorff and his family did not want to talk to the investigator.  Deardorff's counsel chose to move the mitigation investigator off the case, but he did not hire another investigator because Deardorff told him to not hire another one.  He recalled that Deardorff stated he did not want to present any mitigation evidence because he did not want anyone looking into his personal life.

Deardorff also submitted an affidavit in support of his claims.  He stated that, "[a]t no time" did he tell his attorneys that he did not want them to investigate or present mitigation.  He explained that he did not want to work with the specific mitigation investigator his counsel had retained and that was why he refused to speak to the investigator, not that he refused to participate in a mitigation investigation outright.  Overall, Deardorff proffered 22 affidavits, many of which related to his penalty phase ineffective-

assistance claim. Two of these affidavits came from clinical psychologists who proffered various non-statutory mitigating circumstances that they believed should have been identified during the penalty phase.[3]

Following the hearing, the state court denied the remaining claims in Deardorff's amended Rule 32 petition. Relevant here, it explained that it had considered all the evidence presented, including testimony from the evidentiary hearing and the affidavits Deardorff submitted. The court then noted the record evidence establishing that Deardorff requested his counsel not to conduct a mitigation investigation or present mitigating evidence. It explained that counsel attempted to conduct a mitigation

---

[3] This evidence included that: (1) Deardorff's family had a history of mood disorders and there might be a genetic component; (2) although there was no history of psychiatric treatment, Deardorff might suffer from Bipolar II disorder and may have been experiencing symptoms related to that disorder leading up to, and at the time of the crime; (3) Deardorff was intelligent with excellent problem solving skills; (4) he had 23 adverse developmental factors present in his background; (5) he experienced head trauma as a child; (6) he was an average student and advanced normally; (7) he dropped out of high school during his senior year to join the Navy, eventually getting his diploma in the service; (8) he did very well in the Navy and advanced quickly, until he went AWOL and was later discharged; (9) Deardorff's biological father left when he was a baby and was not involved in his life; (10) Deardorff was adopted by his stepfather, who was a good person, but emotionally distant and uninvolved; (11) his parents went through an ugly divorce when he was a teen; and (12) Deardorff had several unsuccessful relationships with women as an adult and had some cocaine dependence at one point.

23-11589                Opinion of the Court                13

investigation by use of an investigator, but that Deardorff and his family were uncooperative. The state court further emphasized that Deardorff reiterated his desire to argue innocence instead of mitigation during the penalty phase. Based upon these facts, the state court determined Deardorff could not establish deficient performance because trial counsel had adopted a reasonable litigation strategy. As to prejudice, the court considered the evidence Deardorff introduced, including the proffered non-statutory mitigating circumstances, and determined that Deardorff could not establish prejudice either.

Deardorff appealed from the denial of his amended Rule 32 petition, which the ACCA affirmed. As to Deardorff's argument regarding the introduction of Turner's will, the ACCA concluded that the will was not hearsay because it was not offered for the truth of the matter asserted. As such, the introduction of the will did not violate the Confrontation Clause, and had Deardorff's counsel raised such an objection, it would have been meritless. Thus, the ACCA ruled, counsel could not be deemed ineffective for failing to raise a meritless objection. The ACCA did not address prejudice with regard to the claim concerning Turner's will. Regarding Deardorff's mitigation argument, the ACCA determined that the record supported the state court's determination and Deardorff failed to establish his counsel performed ineffectively.

Following the ACCA's affirmance of the denial of his amended Rule 32 petition, Deardorff petitioned the ASC for a writ

of certiorari, which the ASC denied without opinion. Deardorff's § 2254 habeas petition followed.

### III.    DEARDORFF'S § 2254 PETITION

Deardorff raised nine claims for relief in his § 2254 petition. As relevant to the current appeal, Deardorff argued that his trial counsel provided ineffective assistance by failing to: (1) object to the admission of the victim's will on Confrontation Clause grounds; and (2) investigate and present mitigating evidence.

The district court denied Deardorff relief. As to the first issue, the district court ruled that the ACCA's resolution of this claim was not contrary to, or an unreasonable application of, federal law, nor was it based on an unreasonable determination of the facts. It agreed with the ACCA that the will was not testimonial in nature and that it was not entered into evidence to prove the truth of the matter asserted. Thus, the introduction of Turner's will did not violate the Confrontation Clause, meaning that Deardorff's counsel could not be deemed deficient for failing to make a meritless objection. The district court stated that the "failure to appropriately limit the jury's use of this evidence with an instruction from the court" was "concerning," but that it fell short of ineffective assistance of counsel because Deardorff could not establish prejudice. The court concluded that the jury had "abundant evidence" and that it could not reasonably be said that the trial would have likely had a different outcome.

Regarding Deardorff's mitigation-based ineffective-assistance claim, the district court again determined that the ACCA

appropriately resolved the claim. It pointed to trial counsel's testimony that residual doubt and innocence were the focal points of trial, and that Deardorff did not want to introduce mitigating evidence. As such, Deardorff could not establish deficient performance because trial counsel executed a reasonable trial strategy. The district court also ruled that Deardorff failed to establish prejudice arising from his mitigation claim.

Although the district court denied relief on both claims, it did grant Deardorff a COA on his ineffective-assistance-of-counsel claim as to the investigation and presentation of mitigation evidence. Upon appeal to this Court, Deardorff moved to expand the COA, which we granted in part. As such, the following two issues are before us:

> Whether Deardorff's trial counsel was ineffective for failing to object, on Confrontation Clause grounds, to the admission of testimonial statements contained in the codicil of Mr. Turner's will?; [and]

> Whether Deardorff's trial counsel was ineffective during the penalty phase for failing to locate and present mitigation evidence and failing to prepare the witnesses called?

## IV.    STANDARD OF REVIEW & RELEVANT LAW

To obtain habeas relief under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a petitioner must demonstrate that the state court's postconviction ruling was either (1) "contrary to, or involved an unreasonable application of, clearly

established Federal law, as determined by the Supreme Court of the United States;" or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1), (2). A state court's decision is "contrary to" federal law if the "state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 413 (2000). A state court's decision is based on an "unreasonable application" of federal law if "the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* A state court's factual findings are presumed correct, and a petitioner bears the burden of rebutting that presumption by clear and convincing evidence. *Pye v. Warden, Ga. Diagnostic Prison*, 50 F.4th 1025, 1034 (11th Cir. 2022) (*en banc*).

We review *de novo* the district court's legal conclusions and its factual findings for clear error. *Hardwick v. Sec'y, Fla. Dep't of Corr.*, 803 F.3d 541, 545 (11th Cir. 2015). The district court's findings on a petitioner's ineffective assistance of counsel claim are reviewed *de novo* because the claim presents an issue of mixed law and fact. *Id.* When analyzing an ineffective assistance claim under § 2254(d), this Court's review is "doubly" deferential. *Harrington v. Richter*, 562 U.S. 86, 105 (2011). Thus, "the question is not whether counsel's actions were reasonable," but "whether there is any

reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*

## V.    ANALYSIS

A successful ineffective assistance of counsel claim requires a petitioner to demonstrate that his counsel performed deficiently, and that the deficiency prejudiced him. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To establish deficient performance, the petitioner must show that his counsel's actions fell below an objective standard of reasonableness, which is analyzed under prevailing professional norms. *Wiggins v. Smith*, 539 U.S. 510, 521 (2003). This analysis requires courts to engage in a context-dependent analysis of the challenged conduct as seen from counsel's perspective at the time of the challenged representation. *Id.* at 523. Counsel's judgments are entitled to considerable deference. *Rompilla v. Beard*, 545 U.S. 374, 381 (2005). To overcome *Strickland*'s presumption of reasonableness, a petitioner must show that "no competent counsel" would have done what his trial counsel did. *Chandler v. United States*, 218 F.3d 1305, 1315 (11th Cir. 2000) (*en banc*).

To establish prejudice, the petitioner must show a reasonable probability that, but for his counsel's deficient performance, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 694. We need not address both prongs of the test if the movant's claim fails under just one of them. *Id.* at 697.

### A. *Deardorff Was Not Prejudiced by His Counsel's Failure to Object to Turner's Will.*

Because the ACCA never reached the issue of prejudice on Deardorff's ineffective-assistance claim related to Turner's will, our review is not circumscribed by a state court conclusion as to prejudice, and "we examine this element of the *Strickland* claim *de novo*." *Rompilla*, 545 U.S. at 390. Prejudice requires proof of "unprofessional errors so egregious that the trial was rendered unfair and the verdict rendered suspect." *Johnson v. Alabama*, 256 F.3d 1156, 1177 (11th Cir. 2001) (internal quotation marks omitted). Thus, "[i]t is not enough to show that the errors had some conceivable effect on the outcome." *Harrington*, 562 U.S. at 104 (internal quotation marks omitted). Where "sufficient conventional circumstantial evidence" points to the petitioner's guilt, a petitioner generally cannot establish prejudice. *See id.* at 113 (noting that "there was . . . sufficient conventional circumstantial evidence pointing to [the petitioner's] guilt" when holding that the petitioner could not establish prejudice); *see also Brownlee v. Haley*, 306 F.3d 1043, 1060 (11th Cir. 2002) (explaining that, when reviewing the prejudice prong of an ineffective assistance of counsel claim, courts must consider the totality of the evidence presented to the jury).

On appeal, Deardorff continues to argue that the ACCA's determination that his counsel did not perform ineffectively by failing to object to, or request a limiting instruction related to, Turner's will was contrary to, or an unreasonable application of, federal law and an unreasonable determination of the facts. To prejudice specifically, he argues that Turner's will was the key evidence pointing

23-11589                Opinion of the Court                19

to him as Turner's killer, and that the jury's consideration of the will affected the outcome of his trial.

We disagree. Without the will, the following evidence pointed to Deardorff as Turner's killer: (1) motive, stemming from the eviction and asset seizure initiated against Deardorff by Turner; (2) Peacock's confession; (3) the money, handgun, automobile parts paperwork, and pornographic materials found in the vehicle Deardorff was riding in prior to his arrest; (4) the duct tape found in Deardorff's shared storage space that forensically matched the tape used to bind Turner, along with Turner's binoculars and borrowed cameras; and (5) the incriminating statements Deardorff made to police upon his arrest. Regardless of whether Deardorff's counsel performed deficiently by failing to object to the introduction of the will or failing to request a limiting instruction, Deardorff cannot establish that those failures were "so egregious" that his trial was rendered unfair and the verdict suspect. *Johnson*, 256 F.3d at 1177. Instead, ample evidence supports the jury's guilty verdict which we must consider in the prejudice analysis. *Harrington*, 562 U.S. at 113; *Brownlee*, 306 F.3d at 1060.

Deardorff simply cannot establish that there was a reasonable probability that, but for counsel's failures, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 694. Accordingly, we affirm the district court's denial of relief as to this claim.

B.  *Deardorff's Counsel Did Not Perform Deficiently During the Investigation into or Presentation of Mitigation Evidence.*

It is well-established that counsel must participate in reasonable mitigation investigations.  *Cummings v. Sec'y for Dep't of Corr.*, 588 F.3d 1331, 1356 (11th Cir. 2009).  Nevertheless, counsel is not required to seek independent mental health evaluations to ensure constitutionally sufficient performance.  *Holladay v. Haley*, 209 F.3d 1243, 1250 (11th Cir. 2000).  Instead, the main concerns are whether counsel's investigation supported his decision to not introduce certain mitigation evidence, and whether that decision was reasonable.  *Johnson v. Sec'y, DOC*, 643 F.3d 907, 931 (11th Cir. 2011).  If reasonable jurists could disagree about the state court's determination that counsel's investigative decisions were reasonable, habeas relief should be denied.  *Id.* at 932.

Where an attorney's decision to not investigate potential mitigation evidence is being challenged, we must assess that decision for reasonableness in light of the surrounding circumstances, "applying a heavy measure of deference to counsel's judgments." *Cummings*, 588 F.3d at 1356 (internal quotation marks omitted).  Importantly, "the scope of the duty to investigate mitigation evidence is substantially affected by the defendant's actions, statements, and instructions."  *Id.* at 1357.  In cases where a mentally competent defendant "affirmatively instructed his counsel to not investigate or present mitigation evidence," counsel's decision not to investigate or present mitigation evidence may be considered reasonable because the scope of counsel's duty to investigate is greatly

circumscribed. *Id.* at 1357-59; *see also Blankenship v. Hall*, 542 F.3d 1253, 1276-77 (11th Cir. 2008) (affirming denial of habeas relief based on counsel's failure to investigate mitigation evidence where defendant instructed counsel not to contact his family and that, "[a]ssuming [counsel] did not know the details of his client's background, Blankenship's admonishment to [counsel] not to contact his family cannot be ignored"); *Knight v. Dugger*, 863 F.2d 705, 750 (11th Cir. 1988) ("Although a capital defendant's stated desire not to use character witnesses does not negate the duty to investigate, it limits the scope of the investigation required."); *Tafero v. Wainwright*, 796 F.2d 1314, 1320 (11th Cir. 1986) ("[A] defendant's decision communicated to his counsel as to who he wants to leave out of the investigation, while not negating the duty to investigate, does limit the scope of the investigation.").

When a petitioner denies his guilt at trial, "residual doubt is perhaps the most effective strategy to employ at sentencing." *Chandler*, 218 F.3d at 1320 n.28. "[T]he law itself points to and lays the foundation for a good argument based on lingering doubt when the jury is later asked to impose death . . . . Nothing about this argument signals submissiveness or fatalism; stressing residual doubt is a straightforward and sound defense." *Id.* Thus, counsel cannot be deemed ineffective "when he has taken a line of defense which is objectively reasonable." *Id.* Additionally, counsel is "entitled to formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies." *Harrington*, 562 U.S. at 107.

22                    Opinion of the Court                    23-11589

Witness credibility "is the province and function of the state courts, not a federal court engaging in habeas review." *Consalvo v. Sec'y for Dep't of Corr.*, 664 F.3d 842, 845 (11th Cir. 2011). As such, we cannot redetermine the credibility of a witness whose demeanor was observed by the state court. *Id.* Witness credibility, therefore, is a question of fact entitled to a presumption of correctness that a petitioner must rebut with clear and convincing evidence. *Id.* (citing 28 U.S.C. § 2254(e)).

Before us, Deardorff argues that his trial counsel's failure to locate and present mitigation evidence or prepare the witnesses called qualifies as ineffective assistance of counsel. He asserts that counsel's use of an ineffective mitigation investigator, failure to hire another investigator or investigate on his own, and subsequent cursory presentation of mitigation evidence during the penalty phase was constitutionally deficient performance that entitles him to habeas relief. Deardorff also asserts that the ACCA's factual determination that he instructed counsel not to perform a mitigation investigation was unreasonable given his affidavit to the contrary.

We, again, disagree. As an initial matter, the state court's determination that Deardorff instructed his counsel that he did not want to present mitigation is not an unreasonable determination of the facts. The state court's choice of which testimony to credit is a credibility determination. We are not in a position, on federal habeas review, to question the state court's factual finding on this point, especially where Deardorff has not presented any clear and convincing evidence as to why the state court should not have

23-11589               Opinion of the Court                      23

credited his counsel's version of events. *Consalvo*, 664 F.3d at 845. Therefore, the state court's resolution of Deardorff's claim was not contrary to, or an unreasonable application of, federal law. While Deardorff's counsel was required to perform a mitigation investigation, his duty was circumscribed by Deardorff's explicit instruction to (1) not perform a mitigation investigation, and (2) not hire a new investigator after the first one was taken off the case. *Cummings*, 588 F.3d at 1357-59. As such, after both Deardorff and his family refused to cooperate with the first mitigation investigator, counsel's decision to not investigate further was not so unreasonable that "no competent counsel" would have taken that route. *Chandler*, 218 F.3d at 1315.

This conclusion is further supported by the evidence showing that Deardorff's strategy during this trial was to shift blame to Peacock, assert his innocence, and focus on residual doubt. Residual doubt is a sound, reasonable defense that can be effective at sentencing, *see id.* at 1320 n.28, and the record evidence here shows that residual doubt was a recurring theme throughout Deardorff's trial and sentencing.

For these reasons, Deardorff cannot establish that his trial counsel performed deficiently during the mitigation investigation or preparation. As such, the district court properly denied Deardorff relief on this claim.

## VI.  CONCLUSION

For these reasons, we **AFFIRM** the district court's denial of Deardorff's § 2254 habeas petition.